## STATE OF CONNECTICUT *v.* MAURICE M.*
### (SC 18454)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan, Eveleigh and
Harper, Js.

* In accordance with our policy of protecting the privacy interests of the
victims of the crime of risk of injury to a child, we decline to identify the
victims or others through whom the victims' identities may be ascertained.
See General Statutes § 54-86e.

Argued March 23—officially released November 29, 2011

*Kirstin B. Coffin*, special public defender, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Nicole I. Christie*, assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The defendant, Maurice M., appeals, upon our grant of his petition for certification,[1] from the judgment of the Appellate Court affirming the trial court's judgment revoking his probation pursuant to General Statutes § 53a-32,[2] on the basis of the trial

[1] We granted the defendant's petition for certification limited to the following issue: "Did the Appellate Court properly hold that there was sufficient evidence that the defendant violated his probation by committing the offense of risk of injury to a child in violation of General Statutes § 53-21 (a) (1)?" *State* v. *Maurice M.*, 293 Conn. 926, 980 A.2d 913 (2009).

[2] General Statutes § 53a-32 provides in relevant part: "(a) At any time during the period of probation or conditional discharge, the court or any judge thereof may issue a warrant for the arrest of a defendant for violation of any of the conditions of probation or conditional discharge, or may issue a notice to appear to answer to a charge of such violation, which notice shall be personally served upon the defendant. Any such warrant shall authorize all officers named therein to return the defendant to the custody of the court or to any suitable detention facility designated by the court. . . .

"(d) If such violation is established, the court may: (1) Continue the sentence of probation or conditional discharge; (2) modify or enlarge the conditions of probation or conditional discharge; (3) extend the period of probation or conditional discharge, provided the original period with any extensions shall not exceed the periods authorized by section 53a-29; or (4) revoke the sentence of probation or conditional discharge. If such sentence is revoked, the court shall require the defendant to serve the sentence imposed or impose any lesser sentence. Any such lesser sentence may include a term of imprisonment, all or a portion of which may be suspended entirely or after a period set by the court, followed by a period of probation with such conditions as the court may establish. No such revocation shall be ordered, except upon consideration of the whole record and unless such violation is established by the introduction of reliable and probative evidence and by a preponderance of the evidence."

Although § 53a-32 was amended since the time of the defendant's probation revocation proceedings; see Public Acts 2008, No. 08-102, § 7; Public Acts 2010, No. 10-43, § 20; the changes, including the redesignation of certain subsections, are not relevant to this appeal. For purposes of clarity, we refer herein to the current revision of the statute.

court's finding that the defendant had committed the crime of risk of injury to a child in violation of General Statutes § 53-21 (a) (1).[3] *State* v. *Maurice M.*, 116 Conn. App. 1, 3, 975 A.2d 90 (2009). On appeal, the defendant claims that the Appellate Court improperly concluded that there was sufficient evidence that he violated his probation by committing the crime of risk of injury to a child when he failed to supervise a two year old child who was in his care and able to exit the home. We agree with the defendant and, accordingly, reverse the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following relevant undisputed facts and procedural history. "On February 4, 2004, the defendant was convicted of assault in the third degree and sentenced to one year incarceration, execution suspended, and three years probation. The standard conditions of the defendant's probation included that he refrain from violating 'any criminal law of the United States, this state or any other state or territory.' On November 26, 2006, the defendant was arrested and charged with risk of injury to a child and, subsequently, with violation of probation.

"The record reveals that the following events led to the defendant's arrest on November 26, 2006. At approximately 11 a.m., Joseph Mortari was driving east on Main Street in East Windsor when he saw a pair of brown children's shoes in the roadway near the center divider line. In an attempt to avoid running over the

---

[3] General Statutes § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony . . . ."

Although § 53-21 was amended by No. 07-143, § 4, of the 2007 Public Acts, those amendments have no bearing on this appeal. For convenience, we refer herein to the current version of the statute.

shoes, Mortari maneuvered his vehicle slightly to the right. As he did, he caught a glimpse of something white near the curb and, turning his full attention to it, realized that it was a small child dressed in a diaper climbing from the street to the curb. He slammed on his brakes, stopping his vehicle about three feet from the child. As this transpired, another vehicle traveling in the opposite direction also stopped. Donna Caldon exited that vehicle, driven by her husband, Peter Caldon, and retrieved both shoes from the street and the child, who was then on the curb. Mortari left his vehicle in the street, and he and Donna Caldon conversed momentarily. Mortari retrieved his vehicle, doubled back and met the Caldons in a parking lot. The three attempted to persuade the child to tell them his name or where he lived. The child would not respond. The three then decided to call the police.

"Sergeant Michael Hannaford of the East Windsor police department arrived at the scene. After speaking with Mortari and the Caldons, Hannaford started going from house to house on Main Street in an attempt to locate the child's home. Soon after, Hannaford was motioned back to the parking lot by Donna Caldon. Hannaford, after seeing the defendant walking toward Donna Caldon and the child, made his way back to the parking lot. It was ten to fifteen minutes after Hannaford arrived at the scene that the defendant emerged from his home and retrieved the child. After speaking briefly with the defendant, Hannaford directed him to take the child home, so the officer could interview Mortari and the Caldons. After conducting the interview, Hannaford went to the defendant's home. There, he questioned the defendant concerning how the child could have gotten from the home to the street.

"The defendant reported that the child was two years old. The defendant told Hannaford that he was the sole caretaker present in the home for the child and the

child's eight year old brother.[4] The defendant told him that the child was playing with his eight year old brother in the house while the defendant was in the living room lying on the couch watching television. The living room was adjacent to the kitchen, where the back door was located, from which, the defendant concluded, the child had apparently exited the house. Hannaford observed that there were no child safety devices on the door-knobs on the back door. The defendant told Hannaford that at some point, the older child informed him that the two year old was missing. The defendant reported to Hannaford that he then searched the house for the missing child and eventually made his way outside where he and the child were reunited. During Hanna-ford's interview with the defendant, the children's grandparents arrived at the home. Soon after, Hanna-ford arrested the defendant on a charge of having vio-lated § 53-21.

"On October 19, 2007, the court, *T. Sullivan, J.*, held a violation of probation hearing. Following the hearing, the court rendered judgment, finding that the defendant had violated his probation. The court further noted that the defendant was aware of the conditions of his proba-tion, having acknowledged them in writing and reviewed them on three separate occasions with his probation officer. The court further found that the bene-ficial aspects of probation were no longer being served in the defendant's case. Accordingly, the court revoked the defendant's probation and committed him to the custody of the commissioner of correction for the unex-ecuted portion of his original one year sentence." Id., 3–6.

The defendant appealed from the judgment of revoca-tion to the Appellate Court, claiming, inter alia,[5] that

---

[4] As the state notes, although both the trial court and the Appellate Court referred to the older child as the two year old child's brother, the record does not establish the relationship between the two children.

[5] On appeal to the Appellate Court, the defendant also claimed that: (1) § 53-21 (a) (1) is unconstitutionally vague; *State* v. *Maurice M.*, supra, 116

the trial court had improperly concluded that the state had shown by a preponderance of the evidence that the defendant had violated his probation. Id., 19. In a divided opinion, the Appellate Court concluded that the trial court's conclusion was not clearly erroneous and affirmed the judgment of revocation. Id.; see id., 23 (*West, J.*, dissenting). The Appellate Court majority reasoned that the testimony presented at the revocation hearing sufficiently established that the defendant had acted with "reckless disregard for a situation that was inimical to the physical welfare of his child." Id., 18–19. Specifically, the Appellate Court concluded that "[t]he evidence was sufficient to show that the [defendant failed] to supervise his children adequately, despite his knowledge that the back door of his home was unsecured . . . ." Id.

In dissent, Judge West concluded that the evidence was insufficient to support the trial court's finding that the defendant had violated his probation. Id., 26–28. Judge West first observed that, "[e]ssentially, there are two main factual components supporting the [trial] court's ruling: (1) the 'accessibility' of the back door[6]

Conn. App. 6; (2) the trial court applied the incorrect mens rea standard to § 53-21; id., 12; and (3) the trial court abused its discretion in revoking his probation. Id., 19. He does not pursue those claims in this certified appeal.

[6] The trial court specifically stated: "[T]hat's not [the eight year old child's] responsibility to take care of the two year old child and to make sure that the two year old child doesn't get hurt or doesn't leave the house or eat something that he's not supposed to eat. It's the adult's responsibility. And by not fulfilling that responsibility, in this particular instance, a risk of harm to the child existed. *That is, a back door was accessible. He wasn't being watched by the adult.* The adult was doing something totally different." (Emphasis added.)

Although both the trial court and Judge West in the Appellate Court dissent both referred to the " 'accessibility of the back door' "; *State* v. *Maurice M.*, supra, 116 Conn. App. 26; we note that the real concern is not so much the accessibility of the back door itself as it is the accessibility of the exterior of the home *through* the back door. Because the basic claim is that the young child was able to access the exterior of the home through a back door that was somehow not secured in a manner that would prevent him from exiting, we will continue to refer to this factual component as the accessibility of the back door, which properly focuses our analysis on the condition of the back door.

and (2) the lack of supervision of the child." Id., 26. Judge West then concluded that the trial court's finding that the back door to the defendant's home was without a "lock" was clearly erroneous, given the complete lack of testimony by any witness at the revocation hearing relative to a lock on the back door. Id., 26–27. Judge West further concluded that there was no other evidence in the record to sustain the trial court's conclusion that the defendant had committed the crime of risk of injury to a child. Id., 27–28.

On appeal, the defendant argues only that the Appellate Court improperly concluded that there was sufficient evidence that he violated his probation by committing the crime of risk of injury to a child. Specifically, the defendant claims that he did not act with reckless disregard for the child's safety or physical welfare because, in the absence of any evidence of the back door's accessibility, and in light of testimony establishing that his child had never escaped the house in this manner before, it was not reasonably foreseeable that the child would exit the home. The state, in response, contends that the Appellate Court properly concluded that there was sufficient evidence that the defendant committed the offense of risk of injury to a child, and specifically argues, inter alia, that the lack of any past similar incident or evidence of a lock does not preclude the trial court's conclusion. We agree with the defendant and conclude that the Appellate Court improperly determined that, under the facts and circumstances of this case, there was sufficient evidence that the defendant had committed the crime of risk of injury to a child.

We begin with the applicable legal principles. First, we note "that revocation of probation hearings, pursuant to § 53a-32, are comprised of two distinct phases, each with a distinct purpose. . . . In the evidentiary phase, [a] factual determination by a trial court as to

whether a probationer has violated a condition of probation must first be made. . . . In the dispositional phase, [i]f a violation is found, a court must next determine whether probation should be revoked because the beneficial aspects of probation are no longer being served." (Citations omitted; internal quotation marks omitted.) *State* v. *Preston*, 286 Conn. 367, 375–76, 944 A.2d 276 (2008). "Since there are two distinct components of the revocation hearing, our standard of review differs depending on which part of the hearing we are reviewing." (Internal quotation marks omitted.) *State* v. *Faraday*, 268 Conn. 174, 185, 842 A.2d 567 (2004).

Because the present case concerns the evidentiary phase and the trial court's factual finding that the defendant violated his probation, we are guided by the standard of review applicable to that phase. "The law governing the standard of proof for a violation of probation is well settled. . . . [A]ll that is required in a probation violation proceeding is enough to satisfy the court within its sound judicial discretion that the probationer has not met the terms of his probation. . . . It is also well settled that a trial court may not find a violation of probation unless it finds that the predicate facts underlying the violation have been established by a preponderance of the evidence at the hearing—that is, the evidence must induce a reasonable belief that it is more probable than not that the defendant has violated a condition of his or her probation. . . . In making its factual determination, the trial court is entitled to draw reasonable and logical inferences from the evidence. . . . Accordingly, [a] challenge to the sufficiency of the evidence is based on the court's factual findings. The proper standard of review is whether the court's findings were clearly erroneous based on the evidence. . . . A court's finding of fact is clearly erroneous and its conclusions drawn from that finding lack sufficient evidence when there is no evidence in the record to sup-

port [the court's finding of fact] . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *State* v. *Benjamin*, 299 Conn. 223, 235–36, 9 A.3d 338 (2010). "In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Hill*, 256 Conn. 412, 425–26, 773 A.2d 931 (2001).[7]

Further, we note that the state charged the defendant with violating the " 'situation' " prong of § 53-21. "In order to establish the crime of risk of injury to a child under the situation prong of § 53-21 (a) (1), the state must prove that the defendant wilfully or unlawfully caused or permitted a child under the age of sixteen years to be placed in a situation where the life or limb of the child was endangered, the health of the child was likely to be injured, or the morals of the child

[7] The dissent spends much time focused on what it perceives to be our consideration of the evidence in light of a more rigorous standard of proof than that called for in probation revocation hearings. Specifically, the dissent states that we "actually [employ] the far more demanding criminal standard of proof beyond a reasonable doubt." The dissent's argument, however, conflates two separate and distinct concepts: the quantum of proof that the state is required to present to establish the existence of any given fact, and the existence of the predicate facts necessary to prove the commission of the underlying crime as a matter of law. As previously stated, it is well established "that a trial court may not find a violation of probation unless it finds that *the predicate facts underlying the violation* have been established by a preponderance of the evidence at the hearing . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Benjamin*, supra, 299 Conn. 236. Put differently, those predicate facts proved by the state in this case are insufficient, either individually or in the aggregate, to establish a violation of § 53-21 (a) (1), which, in this case, served as the foundation for the trial court's finding of a violation of probation. In other words, even assuming that the facts in this case have been proven beyond a reasonable doubt, they still do not support the trial court's finding because, as a matter of law, we decline to hold that a parent or guardian has violated § 53-21 solely based on evidence showing his or her failure to supervise his young child inside the home. See also footnote 18 of this opinion.

were likely to be impaired. Conduct is wilful when done purposefully and with knowledge of [its] likely consequences. . . . A defendant's failure to act when under a duty to do so, which causes a dangerous situation to exist or continue, may be sufficient to support a conviction under § 53-21 (a) (1)." (Citation omitted; internal quotation marks omitted.) *State* v. *Na'im B.*, 288 Conn. 290, 297, 952 A.2d 755 (2008). Moreover, "[s]pecific intent is not a necessary requirement of the statute. Rather, the intent to do some act coupled with a reckless disregard of the consequences . . . of that act is sufficient to [establish] a violation of the statute." (Internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 173, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006).

Furthermore, as this court has recognized, "§ 53-21 (a) (1) is broadly drafted and was intended to apply to any conduct, illegal or not, that *foreseeably* could result in injury to the health of a child." (Emphasis added.) *State* v. *Scruggs*, 279 Conn. 698, 724–25, 905 A.2d 24 (2006). Although no Connecticut appellate court has directly addressed a sufficiency challenge to a finding of risk of injury to a child under these facts—namely, inadequate supervision by a parent *in* the home as a basis for finding a probation violation—the determination of the foreseeability of the dangerous result necessarily must be fact specific. In *Barnes* v. *Commonwealth*, 47 Va. App. 105, 622 S.E.2d 278 (2005), the Court of Appeals of Virginia, in affirming the defendant's conviction of criminal negligence for leaving her two young children home alone unsupervised; id., 109; noted that "the sufficiency analysis on appeal depends entirely on the specific circumstances of each case: the gravity and character of the possible risks of harm; the degree of accessibility of the parent; the length of time of the abandonment; the age and maturity of the children; the protective measures, if any, taken by the par-

ent; and any other circumstance that would inform the factfinder on the question whether the defendant's conduct was criminally negligent." Id., 113. This fact specific approach, and the attendant requirement to consider the totality of the circumstances of each case, is consistent with the foreseeability element of § 53-21 (a) (1), and provides the necessary guidance to determine whether a given defendant has committed the crime of risk of injury to a child by failing to supervise that child adequately. Accordingly, we adopt this nonexclusive list of factors to be considered in risk of injury cases where the primary charge is inadequate supervision by a parent in the home.

Against this legal backdrop, we turn to the defendant's challenge to the sufficiency of the evidence adduced at the revocation hearing. At the outset, we note that it is undisputed that the defendant was not supervising the child inside the home, and the trial court so found. Evidence of the defendant's wilful failure to supervise his child inside the home, however, does not, on its own, establish the defendant's commission of the crime of risk of injury to a child; the totality of the circumstances surrounding the defendant's actions must color the character of the defendant's conduct. "To convict a defendant of risk of injury to a child, a court must find that the defendant acted wilfully and that he either intended the resulting injury to the victim, or he knew that the injury would occur, *or that his conduct was of such a character that it demonstrated a reckless disregard of the consequences.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Guitard*, 61 Conn. App. 531, 543, 765 A.2d 30, cert. denied, 255 Conn. 952, 770 A.2d 32 (2001); see also *State* v. *Cutro*, 37 Conn. App. 534, 539–40, 657 A.2d 239 (1995); *State* v. *Torrice*, 20 Conn. App. 75, 81, 564 A.2d 330, cert. denied, 213 Conn. 809, 568 A.2d 794 (1989).

Thus, because the state did not allege that the defendant intended to injure the child or knew that injury would occur, we are left with the question of whether there was sufficient evidence that the defendant's "conduct was of such a character that it demonstrated a reckless disregard of the consequences." *State* v. *Cutro*, supra, 37 Conn. App. 540. "Recklessness involves a subjective realization of [a] risk and a conscious decision to ignore it. . . . It does not involve intentional conduct because one who acts recklessly does not have a conscious objective to cause a particular result." (Internal quotation marks omitted.) *State* v. *Jones*, 289 Conn. 742, 756, 961 A.2d 322 (2008). Accordingly, we review the trial court's findings with respect to the foreseeability factors for clear error, drawing every reasonable presumption in favor of that court's rulings. *State* v. *Hill*, supra, 256 Conn. 425–26.

The trial court could have found the following facts relevant to the "gravity and character of the possible risks of harm," and "the length of time of the abandonment . . . ." *Barnes* v. *Commonwealth*, supra, 47 Va. App. 113. The defendant lived 100 feet from a narrow, small town road that, at times, was heavily traveled. On November 26, 2006, the defendant's two year old son exited the defendant's home through the back door, which was not equipped with a child safety device, wearing only a diaper, and maybe a shirt. Between twenty and twenty-five minutes may have passed from the time that witnesses first saw the child outside the home to the time that the defendant appeared to retrieve his child, and the eight year old child, with whom the two year old child had been playing, spent at least a few minutes searching for the child before alerting the defendant that the two year old was missing. From this information, the trial court could have concluded that the defendant's two year old son was without adult supervision for at least twenty-five to thirty minutes,

and that the proximity of the defendant's home to a busy street presented a dangerous condition.

Although we acknowledge that serious harm or death could have befallen the young child, the mere existence of a dangerous outcome does not necessarily dictate that there was an unsafe condition that caused it. Nor can the foreseeability of an event be presumed simply from the actual occurrence of that event; instead, the severity of the risk is but one factor to consider in the foreseeability inquiry. See *State* v. *Scruggs*, supra, 279 Conn. 722 ("[a]s we have suggested, actual effects are not necessarily foreseeable effects"). Moreover, there is no evidence in the record indicating the amount of time that the child was without adult supervision *inside the home before exiting*. The testimony at the revocation hearing addressed only the length of time between the time that the child was determined to be missing and the time that the defendant emerged from his home. Nor is there any evidence as to the length of time between when the defendant became aware of the child's absence and when he arrived outside where the child was located. Indeed, the state did not establish how long the defendant looked for the child inside the house before looking outside, or the lapse of time between the child's exit from the house and the commencement of the defendant's search for the child. Accordingly, the trial court's conclusions relative to the dangerous condition and the length of time during which the child was without adult supervision were derived from the *result* of the child's escape and, alone, could not have established that the child's escape was foreseeable.[8]

---

[8] Although not ideal, it is by no means unusual for a parent to leave his or her young child unsupervised for a short period of time, often in front of a television. See, e.g., The Henry J. Kaiser Family Foundation, "The Media Family: Electronic Media in the Lives of Infants, Toddlers, Preschoolers and Their Parents," (2006) p. 4 ("[p]arents use TV or DVDs as a 'safe' activity their kids can enjoy while the grownups get dressed for work, make a meal, or do the household chores"); id., p. 14 ("[m]any parents speak of the

With respect to "the age and maturity of the [child]"; *Barnes* v. *Commonwealth*, supra, 47 Va. App. 113; we also acknowledge that the alleged victim in the present case was only two years old. We note, however, that although younger children, like the child in the present case, require heightened supervision, given their proclivity for exploration, any deficit in that supervision can be mitigated by other factors that would tend to reduce the potential risk to which the child may be exposed, including the existence of protective measures, the accessibility of a parent, the presence of an older child, and the history of the child's behavior. As discussed later, these factors effectively mitigated the two year old child's young age.

With respect to the "protective measures . . . taken by the [defendant]"; id.; although the trial court expressly concluded that the back door was accessible, facts pertinent to the risk of the child exiting through the back door were not established by the record. This evidentiary gap, acknowledged by both parties, is underscored by the trial court's repeated references to the absence of a lock on the back door, a finding that, as Judge West noted in his dissenting opinion in the Appellate Court, has no factual support in the record.[9]

numerous demands on their time and of their strong need to keep their kids occupied while they get their chores done"); id., p. 38 (32 percent of parents of six month to six year old children surveyed reported that parent was in room watching television, DVD or videos with child about one half of time or less that child was watching); F. Zimmerman, "Television and DVD/Video Viewing in Children Younger than 2 Years," 161 Archives of Pediatrics & Adolescent Med. 473, 475, 476–78 (2007) (20.5 percent of parents surveyed reporting need to "get things done" as "most important reason" for children watching television). Indeed, it is hard to imagine how a single parent might otherwise shower and prepare for work in the morning, cook dinner, or do laundry, without leaving his young child or children unsupervised for a short period of time.

[9] In its oral decision, the trial court stated, in the context of describing the risks to young children in a house, that, in the present case, "there was no lock on that back door or screen. There was no lock. There was nothing to prevent [the child] from going out. . . . There was no lock on the door." In response to the defendant's motion for articulation, the trial court

The only evidence offered relative to the back door or doors of the defendant's home, however, was Hannaford's testimony "that there [were] *no safety devices* on the doorknobs or such that, you know, one would normally do with young children to *prevent them from opening the doors*, etcetera." (Emphasis added.) Indeed, there is no indication as to what exactly the missing "safety device" was; i.e., whether Hannaford was referring to a circular plastic device that covers metallic doorknobs, a hook and eye mechanism to keep an exterior screen door from opening, or some other device.[10] On the basis of the lack of evidence supporting the trial court's finding that the back door lacked a lock, we conclude that the finding was clearly erroneous.[11]

Moreover, we further conclude that the conclusion drawn from that erroneous finding—that is, that the back door was accessible to a two year old child—cannot be sustained by the evidence in the record. With the exception of Hannaford's testimony that the back door did not have any "safety devices," the record is devoid of any other evidence relative to the nature of

expanded this finding to include the absence of a child safety device, but reiterated its finding that there was no lock on the back door: "neither the back door nor the back screen door of his house had a lock or child safety device thus permitting the child to be able to exit the house."

[10] We recognize that the trial court's statement in its articulation that the back door did not have a "child safety device" is consistent with Hannaford's testimony "that there [were] no safety devices on the doorknobs or such that, you know, one would normally do with young children to prevent them from opening the doors . . . ." Nevertheless, we conclude that Hannaford's testimony is too vague and ambiguous in its bare reference of a lack of safety devices to sustain the trial court's conclusion that the back door was accessible to the young child.

[11] Although the trial court and the Appellate Court may have, in part, based their conclusions that the back door was accessible by virtue of the young child's actual exit from the home; see *State* v. *Maurice M.*, supra, 116 Conn. App. 16 n.4 (noting "child's unimpeded access to the street"); a point that the state advances, as previously stated, the ease with which the child exited the home cannot be presumed by the child's actual presence outside the home.

the back door, which undoubtedly is material to the ease with which a two year old child could have accessed the exterior of the home. For example, there is no clear indication in the record as to how many doors separated the interior of the home from the exterior, i.e., whether there was both an interior door and an exterior screen or glass door, or only one door.[12] There is also no indication as to whether the back door or doors were ajar or shut at the time the child exited the home.[13] Moreover, there is no indication as to the method by which one would open the back door or doors, i.e., whether one must turn a doorknob and pull open the door; whether one must grasp a handle, depress a thumb lever and pull open the door; or whether one must press a small push latch and push open the door to exit (as is common with screen doors). Any of these factors could be relevant to determining whether the defendant reasonably would not have thought that his two year old child possessed the strength and manual dexterity to manipulate the door or doors open. Indeed, there is no indication whether the two year old child left on his own or whether the eight year old child opened the door for him. These unanswered questions demonstrate the lack of evidence before the trial court relative to the ease with which a young toddler may have exited the home. We thus conclude that the state failed to

---

[12] We note that Hannaford referred to both the "back door," in the singular, and to the "doorknobs" and "doors," in the plural. Moreover, the trial court referenced both a "back door" and "screen" or "back screen door" in both its oral memorandum of decision and its articulation. The Appellate Court also noted that "[i]t is unclear from the record whether the defendant's back door had locks or a screen door." *State* v. *Maurice M.*, supra, 116 Conn. App. 16 n.4.

[13] Although there was no direct evidence stating that the back door or doors were closed, the defendant's statement to Hannaford, as described in Hannaford's testimony, that the two year old child "must have opened the back door" suggests that the back door or doors were closed. Hannaford also later testified that the defendant "should [have heard] the door close . . . ."

establish with sufficient evidence the accessibility of the back door.

Finally, with respect to "other circumstance[s] that would inform the factfinder on the question [of] whether the defendant's conduct was [reckless]"; *Barnes* v. *Commonwealth*, supra, 47 Va. App. 113; we also conclude that it was improper for the trial court to fail to give proper weight to the accessibility of the defendant, the age of the child with whom the two year old was playing, and the lack of any prior similar incident. Hannaford testified that the defendant should have heard the back door close because of his proximity to the kitchen where, presumably, the back door was located. The defendant's proximity and accessibility to the child mitigates the child's young age and reduces the foreseeability of the child's escape. Hannaford also testified that the two year old child was playing with an eight year old child. Although we recognize that an eight year old child lacks the maturity and responsibility of an adult, we note that his presence alone carries some weight; the two year old child was not wandering around the home completely unattended. Moreover, we also note that the eight year old child demonstrated at least some minimal level of responsibility by notifying the defendant that the child was missing. Further, Hannaford's testimony established that the child had never left the house before under these circumstances. Though we certainly recognize that the state need not wait for "catastrophic harm" to occur first before prosecuting an individual for violating § 53-21; *State* v. *Scruggs*, supra, 279 Conn. 722 n.10; as a general proposition, the history, or lack thereof, of past occurrences provides evidence of the foreseeability of a given harm. See, e.g., *Monk* v. *Temple George Associates, LLC*, 273 Conn. 108, 115–16, 869 A.2d 179 (2005) (reasonably foreseeable that assault would occur on premises given history of criminal activity in area). Finally, there is no

evidence regarding the temperament or attitude of the two year old child that might suggest that he often misbehaved, was less prone to follow instructions, or otherwise would have been more at risk for escaping from the home. Thus, we conclude that the evidence was insufficient to establish that the child's escape to the exterior of the house was a reasonably foreseeable result.

Accordingly, we likewise conclude that the evidence was insufficient to establish that the defendant's failure to supervise the child while at home evinced a reckless disregard for the consequences of that conduct in violation of § 53-21 (a) (1).[14] Moreover, notwithstanding the evidence relative to the severity of the possible harm,

___

[14] The state nevertheless contends that the trial court properly relied on additional "undisputed facts" to support its conclusion that the defendant violated § 53-21, including: (1) "the defendant was responsible for the child's safety at the time"; (2) "the defendant was the only adult in the house"; (3) "the older child was not responsible for the younger child"; (4) "the defendant was lying on the couch watching television"; (5) "the defendant was doing something totally different than watching the child"; (6) "the defendant had no idea that the child had left the house"; (7) "the defendant had no idea where the child was"; and (8) "the defendant learned of the child's absence because the older child told him . . . ." Each of these "undisputed facts," however, goes to the defendant's lack of supervision over the child inside the home, a factual predicate that is both uncontested and insufficient, by itself, to sustain the trial court's conclusion. We also note that there was no evidence presented relative to the eight year old child and his relationship to the parties in this case. See footnote 4 of this opinion.

The state also claims that the facts that "the back door was accessible and unsecured" and "the child was in the middle of the highway" support the trial court's conclusion. We disagree. As discussed earlier, the evidence is insufficient to sustain the conclusion that the back door was accessible, and the mere fact that the child was in a dangerous situation does not mean that an unsafe condition caused it.

Finally, we conclude that additional facts cited by the state, which were not specifically found by the trial court—including the defendant's knowledge "that he lived on a busy main street, that the yard was not fenced . . . that the house had no baby-gates or other barriers to prevent roaming, that the defendant did not take any care whatsoever for the welfare of the child . . . did not pay any attention to the fact that the older child spent several minutes looking for the younger child, would not have known of the child's absence but for the older child, and upon retrieving the child, evidenced unnatural annoyance at the child and lack of concern for his condition or

the length of time during which the child was outside, the age of the child and the absence of a safety device on the doorknob, on the basis of the mitigating factors detailed previously, we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State* v. *Benjamin,* supra, 299 Conn. 236; cf. *Wesley* v. *Schaller Subaru, Inc.,* 277 Conn. 526, 544, 557, 893 A.2d 389 (2006) (judgment of trial court reversed on basis of court's "definite and firm conviction that a mistake was committed"); *Socci* v. *Pasiak,* 116 Conn. App. 685, 689, 978 A.2d 96 (2009) (same).[15]

---

return of his desire for affection"—are either reinterpretations of previously mentioned facts, inferences without evidence in the record, or evidence that does not support a finding that the defendant acted with reckless disregard for the consequences. Accordingly, we conclude that these facts do not support the trial court's decision.

[15] We disagree with the dissent's claim that we have engaged in fact finding, and note that, in contrast, it is the dissent that has embraced that role. In particular, we disagree with the dissent's emphasis on the trial court's observations as to the apparent lack of any fence surrounding the defendant's home. At no point during the evidentiary phase of the proceeding did the state ever establish that the defendant's home did not have a fence around the yard. Although the trial court apparently concluded, *during the dispositional phase,* that the defendant "knew that there was no fence around [the back door], as evidenced by the fact that there is now a fence around the back door," the dispositional phase is a distinct phase of the revocation hearing during which the trial court determines "whether probation should be revoked because the beneficial aspects of probation are no longer being served." (Internal quotation marks omitted.) *State* v. *Preston,* supra, 286 Conn. 376. It is during the evidentiary phase, however, that the trial court determines whether the defendant has violated a condition of his probation. Id., 375. Accordingly, because this appeal only challenges the trial court's findings during the evidentiary phase, any consideration in this appeal of evidence presented during the dispositional phase is improper.

Moreover, we note that the dissent's conclusions that the defendant "placed himself in a position from which he personally was unable to react to an emergency or some other problem in a timely fashion"; and the defendant "made no effort to . . . otherwise . . . child proof the house," lack support in the record. Indeed, contrary to the dissent's assertion that the defendant "placed himself in a position from which he personally was unable to react to an emergency or some other problem in a timely fashion," it is undisputed that, upon learning from the eight year old boy that the two year old son was missing, the defendant reacted by searching the home for the child.

Finally, we note that, to the extent that the dissent relies on the demeanor of the defendant when he came outside to retrieve his child, such reliance is

Further, the state's reliance on *State* v. *Branham*, 56 Conn. App. 395, 743 A.2d 635, cert. denied, 252 Conn. 937, 747 A.2d 3 (2000), is misplaced. In *Branham*, the defendant was convicted of risk of injury to a child in violation of § 53-21 for leaving his three children, all under the age of four, alone and unattended in an apartment. Id., 396–97. The mother of the children testified that the children had been left home alone for up to one hour. Id., 398. Additional testimony established that the children had, on previous occasions, left the apartment to look for their mother when she left to use the downstairs telephone, and that drug dealers were in the hallway of the apartment building. Id., 399 n.2. The Appellate Court rejected the defendant's sufficiency claim and affirmed the conviction, concluding that: (1) the jury was entitled to credit the mother's testimony relative to the amount of time that the children were left home alone; and (2) the jury could reasonably infer that leaving three young children home alone placed them in "a dangerous situation . . . thereby exposing them to injury." Id., 398–99.

*Branham* is readily distinguishable from this case. Most notably, the defendant in *Branham* left the three young children at home, *alone and unsupervised*, for up to one hour; id., 398; whereas in the present case, the defendant was present in the home throughout the period in question. In addition, the oldest of the three children in *Branham* was three and one-half years old, and the other two children were ages two and one. Id. In contrast, the two year old child in the present case

misplaced. Putting aside the subjective matter that one person's nonchalance may well be another's stoicism, what occurred after the defendant emerged from the home and, indeed, after the child found his way outside, is irrelevant to the factual predicates necessary to prove a violation of § 53-21 (a) (1). Put differently, although it may well have looked better for the defendant to have approached Hannaford appearing frantic and despondent, his failure to do so does not make the manner in which he had supervised his son any more or less dangerous.

was playing with an eight year old child, who in fact demonstrated at least a minimal level of responsibility by notifying the defendant that the two year old was missing, after which the defendant proceeded to search for the child. Finally, we note that evidence presented in *Branham* establishing foreseeability, namely, the testimony that the children had previously left the apartment when left alone, further distinguishes it from the present case wherein, as we have noted, the testimony indicated that the two year old had never left the home before under these circumstances.[16]

We note that several other Connecticut cases, cited by both parties, finding sufficient evidence to affirm the conviction under the "situation" prong of § 53-21 (a) (1), are all distinguishable from the present case in terms of the plainly and obviously dangerous situation that the defendant had actively created or helped to create. See *State* v. *Na'im B.*, supra, 288 Conn. 292–94 (defendant did not take child with third degree burns to hospital); *State* v. *Sorabella*, supra, 277 Conn. 163–67 (defendant attempted to engage fictitious thirteen year old girl in sexual activities); *State* v. *Padua*, 273 Conn. 138, 158–59, 869 A.2d 192 (2005) (defendant allowed

---

[16] The dissent also cites *State* v. *Fields*, 302 Conn. 236, 24 A.3d 1243 (2011), and *State* v. *George*, 37 Conn. App. 388, 390, 656 A.2d 232 (1995), for the proposition "that leaving young children at home alone for *any* appreciable period of time will support a *conviction* under § 53-21 (a) (1)." (Emphasis in original.) These two cases are likewise distinguishable from this case. In *Fields*, we rejected the defendant's vagueness challenge to § 53-21 (a) (1), where the defendant had forcibly removed *at gunpoint from her home* the babysitter of a one year old child, thereby leaving the child unattended in the crib and *alone in the home* for twenty-five minutes. *State* v. *Fields*, supra, 242–43. Similarly, in *George*, we rejected the defendant's vagueness challenge to § 53-21 (a) (1), where the defendant had left a seventeen month old child home alone while at a bar, after the police, earlier that very same day after the child was previously found unattended in his car, had warned him that such actions could subject him to arrest. *State* v. *George*, supra, 389–90. Thus, these two cases are inapposite to this case, where the defendant was present in the home.

children to have access to marijuana); *State* v. *Davila*, 75 Conn. App. 432, 435, 816 A.2d 673 (defendant fired gun into home wherein children were located), cert. denied, 264 Conn. 909, 826 A.2d 180 (2003), cert. denied, 543 U.S. 897, 125 S. Ct. 92, 160 L. Ed. 2d 166 (2004); see also *State* v. *Cutro*, supra, 37 Conn. App. 536–37 (defendant masturbated in car in mall parking lot). Here, in contrast, the lone claim against the defendant, in the absence of sufficient evidence showing the ready accessibility of the back door, is his lack of supervision of the child who was present in the house with him. Given the dearth of evidence relative to any other potentially dangerous situation that the defendant helped to create or failed to remedy, we decline to conclude that the defendant's failure to supervise the child inside the home, by itself, represents a reckless disregard of the consequences, sufficient to substantiate a conviction under § 53-21 (a) (1).[17]

---

[17] The defendant cites several out-of-state cases in support of the proposition that a parent who is "accessible" to the child or in the home with the child is less culpable for injuries sustained by an unsupervised child. Compare *State* v. *Bennett*, Court of Appeals, Docket No. 68039, 1995 WL 415193, *1–2 (Ohio App. July 13, 1995) (defendant, who was in upstairs bathroom when unsupervised four year old child burned herself using defendant's lighter, did not "recklessly [create] a substantial risk of harm"; court also noted protective measures defendant took and lack of any similar prior incident), and *Ellis* v. *Commonwealth*, 29 Va. App. 548, 551–52, 556–57, 513 S.E.2d 453 (1999) (defendant, who left two year old and four year old home alone while she went to building next door, not criminally negligent when gas stove, which was accidentally left on, caused fire that injured both children), with *State* v. *Fretas*, Court of Appeals, Docket No. 07AP-1046, 2008 WL 4233928, *1, *4 (Ohio App. September 16, 2008) (defendant, who left three year old son at home alone while he went to rent movie, "created a substantial risk of harm for his son"), and *Barnes* v. *Commonwealth*, supra, 47 Va. App. 109, 113 (defendant, who left two year old and four year old home alone while she went shopping, found criminally negligent).

In response, the state relies on *State* v. *Schaffer*, 127 Ohio App. 3d 501, 713 N.E.2d 450 (1998), *In re D.J.*, Court of Appeals, Docket No. 49A05-0803-JV-180, 2008 WL 4149822 (Ind. App. September 10, 2008), *People* v. *Delapaz*, Court of Appeals, Docket No. C045971, 2005 WL 1324850 (Cal. App. June 6, 2005), and *Reyes* v. *State*, 242 Ga. App. 170, 529 S.E.2d 192 (2000), for the proposition that a parent can be liable for reckless endangerment of

Although the defendant here does not challenge § 53-21 (a) (1) as unconstitutionally vague, we also find helpful our analysis in *State* v. *Scruggs*, supra, 279 Conn. 698. In *Scruggs*, we reversed the conviction of a defendant who had been convicted of risk of injury to a child, in relation to the death of her twelve year old son who had committed suicide in their home. Id., 700–701. The defendant had been convicted on the charge that she had maintained an " 'unhealthy and unsafe' " home,

the child even when the parent is home and available to the child. In *Reyes*, although the defendant mother was home, the child was outside, playing in the street and with dogs; additionally, the mother had previously been known to let her children play outside alone. *Reyes* v. *State*, supra, 171–72. *In re D.J.* was a parental termination case, wherein the parents had demonstrated a "continued pattern of neglect," including an incident where the two young children were left in the living room with the "front door wide open . . . ." *In re D.J.*, supra, *6. In *Delapaz*, a one year old child escaped from a home where both the front and back doors were open. *People* v. *Delapaz*, supra, *1. These three cases are thus each distinguishable from the present case, where the two year old was playing inside the home, and there was no evidence that this had ever happened before or that the doors were left open.

In *Schaffer*, a police officer discovered the two year old son of the defendant on a street curb approximately 100 yards from the defendant's home. *State* v. *Schaffer*, supra, 127 Ohio App. 3d 502. The defendant testified that she had lost sight of her child for five to ten minutes, during which the defendant apparently believed that another six year old girl was watching her child upstairs. Id. The defendant's home was located near "two frequently traveled streets" and a pond. Id., 503. The Court of Appeals of Ohio concluded that "such circumstances manifest that [the defendant], in a manner that is not right or good, disregarded the risk that her son could have left the home and walked into the street. Therefore, [the defendant] recklessly created a substantial risk to her son's health by violating her duty of care and/or protection to the child." Id. One judge dissented, concluding that the evidence was not sufficient to sustain the verdict, and stating, "[i]f the facts in the record before us amounted to child endangering, then all parents, including myself, have been guilty of this criminal offense at one time or another." Id., 504 (Christley, J., dissenting). We agree with the dissent's well taken observations and, to the extent that the facts of *Schaffer* mirror the facts in this case, we decline to adopt the majority's reasoning in that case.

Moreover, although we agree with the defendant that a parent's availability is a factor, we note that there are several other factors to consider, as discussed earlier in this opinion. See *Barnes* v. *Commonwealth*, supra, 47 Va. App. 113.

which harmed the health of the child. Id., 702–703. Although the defendant had challenged on appeal both the constitutionality of § 53-21 (a) (1) and the sufficiency of the evidence under which she was convicted, we determined that "these claims [were] inextricably intertwined"; id., 708; and ultimately concluded that as applied to the defendant, § 53-21 (a) (1) was unconstitutionally vague. Id., 719. Although we do not engage in the constitutional vagueness analysis in this case; see footnote 5 of this opinion; we do note that here, as in *Scruggs*, the defendant must be afforded some leeway in the maintenance of his home and supervision of his child. "Not *all* conduct that poses a risk to the mental or physical health of a child is unlawful. Rather, there is an acceptable range of risk." (Emphasis in original.) *State* v. *Scruggs*, supra, 720; cf. *State* v. *George*, 37 Conn. App. 388, 389–92, 656 A.2d 232 (1995) (rejecting vagueness challenge and upholding conviction of defendant who left seventeen month old child home alone while at bar, after police warned him earlier that same day after child was previously found unattended in defendant's car).

Under the facts of the present case, we cannot conclude that the defendant's decision to leave his two year old child unsupervised in another room with an eight year old child falls outside the acceptable range of risk. To conclude otherwise would be to hold a parent, who is home alone and solely responsible for the care and supervision of one or more young children, criminally responsible under what would essentially be a theory of strict liability for leaving his or her children unsupervised *inside* the home for a short period of time, an illogical and impracticable result.[18] In this case,

---

[18] The dissent, criticizing us for apparently utilizing the reasonable doubt standard to assess the evidence in this case while "purport[ing]" to utilize the applicable preponderance of the evidence standard, contends that "our resolution of this appeal simply has no bearing on how we would resolve the defendant's insufficiency claim if this had been a criminal case." We disagree. The state in this case sought to establish that the defendant had

the record merely establishes that the defendant exhibited less than ideal parenting, and, as the Court of Appeals of Ohio aptly stated in reversing a defendant's conviction for child endangerment, "[t]he failure to realize an ideal level of supervisory attention to a child does not equate to acting with heedless indifference to the consequences . . . ." (Internal quotation marks omitted.) *State* v. *McLeod,* 165 Ohio App. 3d 434, 438, 846 N.E.2d 915 (2006). Accordingly, we conclude that the evidence does not sufficiently establish that the defendant violated his probation by committing the crime of risk of injury to a child, and we have the requisite confidence that the trial court's finding to the contrary was a mistake.[19]

violated his probation based on his *commission of a crime*, and the trial court expressly found that the state had proven "by a fair preponderance of the evidence that [the defendant] did, in fact, *commit a crime of placing the child at risk under [§ 53-21].*" (Emphasis added.) Clearly, the trial court's conclusion that the defendant violated his probation was based on its determination that the defendant had committed a crime, a wholly permissible basis, in theory, for finding a defendant guilty of violating his probation. See *State* v. *Benjamin,* supra, 299 Conn. 235 ("revocation may be based upon criminal conduct"). Thus, our disposition of this appeal necessarily carries with it an evaluation of the trial court's interpretation of what, as a matter of law, constitutes a violation of § 53-21, regardless of the standard of proof required to establish the factual predicate for such a violation. It is quite obvious, then, that our resolution of this appeal would indeed have at least some precedential value for future cases, both in probation revocation hearings and criminal trials, involving facts similar to those in this case. See also footnote 7 of this opinion.

[19] We stress that we do not conclude in the present case that a parent or guardian who fails to supervise his or her child inside the home is immunized from liability solely by virtue of his or her presence in the home. Indeed, there may be any number of factual circumstances, established through adequate evidence, which, when considered in conjunction with an individual's failure to supervise a young child in the home, would subject him or her to criminal liability. See, e.g., *Reyes* v. *State,* 242 Ga. App. 170, 171–72, 529 S.E.2d 192 (2000) (evidence presented that mother previously let child play outside alone); *People* v. *Delapaz,* Court of Appeals, Docket No. C045971, 2005 WL 1324850, *1 (Cal. App. June 6, 2005) (child escaped from home where evidence showed front and back doors were open). The record in the present case, however, is devoid of any such evidence.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to the trial court with direction to render judgment for the defendant.

In this opinion ZARELLA, McLACHLAN, EVELEIGH and HARPER, Js., concurred.

PALMER, J., with whom ROGERS, C. J., joins, dissenting. The undisputed evidence reveals that, in the late morning of November 26, 2006, the defendant, Maurice M., while watching television on his living room couch at his East Windsor home, intentionally left his two year old son in the exclusive care and supervision of a second child, an eight year old boy, for an extended, if not indefinite, period of time. Oblivious both with respect to the whereabouts of the two children in the house and what they were doing, the defendant also had failed to secure the back door or child proof the house and yard, circumstances that prompted the trial court reasonably to conclude that the defendant "knew or should have known that a child could easily get out [of the house] . . . ." This evidence fully supported the trial court's determination that it was entirely foreseeable that an eight year old child would not recognize the substantial risk that a two year old child, if left unsupervised for any appreciable period of time, would open an unsecured back door and wander away. I therefore agree with the Appellate Court that the trial court reasonably found, by a mere preponderance of the evidence, that the defendant's extremely irresponsible conduct—conduct that culminated in the two year old leaving the home, unaccompanied and in his diaper, only to be found in a nearby thoroughfare by a motorist who fortunately saw and rescued him—created a situa-

tion inimical to the well-being of the child, in violation of General Statutes § 53-21 (a) (1).[1]

It is clear that the defendant would have violated § 53-21 (a) (1) if he had left his two year old son alone and completely unsupervised for one-half hour or more while he watched television in another part of the house, especially in light of the fact that he knew or should have known that the child had easy access to the yard via the back door. In the majority's view, however, the fact that the defendant enlisted an eight year old child to look after the two year old child radically alters that conclusion. According to the majority, the presence of the eight year old *necessarily* is sufficient to take the defendant's conduct out of the purview of § 53-21 (a) (1). I disagree with the majority because, in my view, the trial court reasonably concluded that an eight year old child lacks the experience, concentration and mature judgment to appreciate the significant risk that a two year old, if afforded even the slightest opportunity, will find an unsecured door, open it and walk away.

In reaching a contrary conclusion, the majority fails to view the evidence in the light most favorable to sustaining the trial court's finding, as it is required to do. Instead, the majority substitutes its own view of the facts for that of the trial court, thereby usurping the fact-finding role of the trial court. Moreover, as I explain more fully hereinafter, each and every one of the factors that the majority identifies as relevant to the determination of whether the evidence presented at the defendant's probation revocation hearing was sufficient to support the trial court's finding—the gravity and character of the possible risks of harm, the

---

[1] As this court repeatedly has explained, § 53-21 (a) (1) prohibits, inter alia, "the creation of situations inimical to [a child's] moral or physical welfare . . . ." (Internal quotation marks omitted.) *State* v. *Nathan J.*, 294 Conn. 243, 251, 982 A.2d 1067 (2009).

degree of accessibility of the parent, the length of time of the abandonment, and the age and maturity of the child—militates in favor of the trial court's conclusion. Finally, the majority purports to assess the validity of the trial court's determination under the civil preponderance of the evidence standard of proof, the standard applicable to probation violation cases, but actually employs the far more demanding criminal standard of proof beyond a reasonable doubt. I therefore dissent.

Although the majority opinion sets forth most of the relevant facts, certain of them bear emphasis. The defendant was charged with violating the terms of his probation after his two year old child was found wandering alone on a main thoroughfare in the town of East Windsor, clad only in a diaper. As the opinion of the Appellate Court explains, the evidence adduced at the defendant's probation revocation hearing established that, on the day in question, "the defendant was solely responsible for the care of his [two year old son and an eight year old boy] and that during this time, the defendant was watching television on the couch in the living room while [the two boys] played in a different part of the house. The defendant was aware that the back door of his home was not secured so as to prevent egress by a toddler. The defendant left the children unsupervised long enough for the two year old child to exit the home without the defendant's knowledge and to walk at least 100 feet away from the home into a busy street where he was nearly struck by a vehicle.[2] The defendant was . . . made aware that the two year old child was missing [only] when the eight year old child notified the defendant that he could not find [the two year old child]. The [two year old] child was outside for [at least twenty-five to thirty minutes] before the

[2] In fact, that vehicle came within three feet of the child before the driver swerved to avoid running him over.

defendant came to retrieve him." *State* v. *Maurice M.*, 116 Conn. App. 1, 8–9, 975 A.2d 90 (2009).

According to Sergeant Michael Hannaford of the East Windsor police department, when the defendant finally appeared, he exhibited no visible signs of concern for the child. Hannaford stated that the defendant acted "noncaring [and] nonchalant," like it "wasn't . . . that big of a deal [that] the child got out . . . ." Indeed, when the child reached his arms out to his father for comfort, the defendant "just . . . turned away" and "ignor[ed] the child." To Hannaford, the defendant appeared "upset" and "[a]ngry," not because the child could have been seriously injured but because "the child had left . . . the house." When Hannaford asked the defendant how the child had gotten out, the defendant responded that "he must have opened the back door" while the defendant "was on the couch watching [the television] or otherwise not paying attention to the children . . . ."

In the course of his investigation, Hannaford visited the defendant's home and observed that there were no child safety devices on the doorknob on the back door to prevent a young child from opening the door. Hannaford also learned that the defendant had left the two year old in the care of another child. Hannaford testified that he arrested the defendant for risk of injury to a child because the defendant's failure to supervise his children had created a situation in which the two year old was able to leave the house unnoticed and nearly get struck by a car.

At the conclusion of the state's case, defense counsel argued that the state's evidence was insufficient to establish, by a fair preponderance of the evidence, that the defendant had created a situation inimical to the safety or well-being of his child in violation of § 53-21 (a) (1) because it was not reasonably foreseeable "that

letting his child play in the house with an older child was placing his child's life or limb in danger." Defense counsel further contended that unsupervised "indoor domestic playing" does not amount to a total lack of supervision, and, therefore, the defendant's case was distinguishable from those in which a parent was found guilty of risk of injury to a child for leaving a child at home without any supervision. Defense counsel also argued that the defendant's conduct was not reckless because, as soon as the defendant became aware that the child was missing, he immediately began to look for him.

The trial court was not persuaded by counsel's arguments and found that the state had proven by a fair preponderance of the evidence that the defendant had committed the crime of risk of injury to a child in violation of his probationary condition barring any criminal conduct. The trial court explained that parents are required by law to protect their children from known risks. Specifically, the court stated: "There are risks in the house. . . . [T]hat's why [people] . . . baby [proof] houses. In this case, the child didn't fall out [of] the second story window, but he also didn't stay in the house. . . . [The child left the property by himself, exiting the house through the unsecured back door.] There was nothing to prevent [the child] from going out. [The defendant] lives in that house. . . . It's his responsibility [as the parent] to make sure that [certain dangers] don't exist . . . . Toddlers migrate. They go everywhere. . . . [It] wasn't . . . [the eight year old child's] responsibility to take care of the two year old child and to make sure that the two year old . . . doesn't get hurt or doesn't leave the house or eat something that he's not supposed to eat. It's the adult's responsibility. And by not fulfilling that responsibility, in this particular instance, a risk of harm to the [two year old] child existed. That is, a back door was accessi-

ble. . . . The [defendant] had no idea where [the child] was in the house . . . . [He] [h]ad no idea that [the child] had left the house. [The child] left the house because he was able to do so. . . . And he managed to get himself into the middle of a highway as [a] result. . . . And it's not the [two year old] child's fault. And it's not the [eight] year old's fault. It's [the defendant's] fault. It's [the defendant's] responsibility as a father and as a caregiver to make sure that [his] child is protected . . . [and] that the child does not leave the house and go wandering . . . down the street . . . ."

Having concluded that the defendant violated his probation, the trial court proceeded to the dispositional phase of the hearing. At that time, the court noted that the defendant had an extensive criminal history, which included multiple probation violations. The court further noted, with respect to the probation violation that is the subject of this appeal, that it was not simply poor parenting that had led to the defendant's arrest but, rather, a reckless disregard for a dangerous condition that the defendant knew or should have known existed. Specifically, the court stated: "He knew that there was no lock on the door. He knew that there was no fence around [his yard] . . . . And he knew or should have known that a child could easily get out [of the house] under those circumstances. It wasn't simply that the child left the premises. He left the premises, and nobody knew about it. [The defendant] didn't know about it because he wasn't supervising [the child]. He left him in the care or supervision of another child and that created a risk of injury to this child, a risk of severe injury. . . . [The child] had to walk across the highway to leave his shoes in the middle of the highway. He had to go right across that road under circumstances that should never have been allowed to exist. And that was a dangerous situation. It's not just a parenting skill. It's almost as though it's a lack of care whatsoever for the

. . . welfare of the child." The court thus concluded, on the basis of the totality of the circumstances, that the beneficial aspects of probation no longer were being served in the defendant's case and, accordingly, revoked the defendant's probation. The Appellate Court thereafter affirmed the trial court's judgment.

In reversing the judgment of the Appellate Court, the majority recognizes, as this court previously stated in *State* v. *Scruggs*, 279 Conn. 698, 724–25, 905 A.2d 24 (2006), that "§ 53-21 (a) (1) is broadly drafted and was intended to apply to any conduct, illegal or not, that foreseeably could result in injury to the health of a child." (Internal quotation marks omitted.) The majority then identifies several nonexclusive factors to be considered in determining whether a particular risk was foreseeable for purposes of a case, such as the present one, involving a claim that a parent or other adult responsible for a child's supervision has violated the law by failing to uphold his or her responsibility. These factors include the age and maturity of the child, the gravity of the risk, the length of time of the abandonment, the degree of the parent's accessibility, and the protective measures that the parent has taken to minimize the risk. The majority concludes, and I agree, that "[t]his fact specific approach, and the attendant requirement to consider the totality of the circumstances of each case, is consistent with the foreseeability element of § 53-21 (a) (1), and provides the necessary guidance to determine whether a given defendant has committed the crime of risk of injury to a child," in this case, by a preponderance of the evidence standard of proof. I disagree with the majority, however, insofar as it determines that, upon application of those factors, no trier of fact rationally could find, by a preponderance of evidence, that the defendant had violated § 53-21 (a) (1) by creating a situation inimical to the two year old child's physical well-being.

Before considering the facts in light of the relevant factors, I first set forth several principles that govern this court's analysis. Because a probation revocation proceeding is akin to a civil, rather than a criminal, proceeding, "a trial court may . . . find a violation of probation [if] it finds that the predicate facts underlying the violation have been established by a preponderance of the evidence at the hearing—that is, the evidence must induce a reasonable belief that it is more probable than not that the defendant has violated a condition of his or her probation." *State* v. *Davis*, 229 Conn. 285, 302, 641 A.2d 370 (1994). Thus, the burden on the state to establish a probation violation "is substantially lower than that for conviction"; *State* v. *Roberson*, 165 Conn. 73, 80, 327 A.2d 556 (1973); which, of course, is proof beyond a reasonable doubt. Accordingly, whether the evidence in the present case is sufficient to support a criminal conviction of the offense of risk of injury to a child in violation of § 53-21 (a) (1) "simply has no relevance whatsoever to an independent determination on the same facts made in a revocation of probation hearing"; (internal quotation marks omitted) *State* v. *Benjamin*, 299 Conn. 223, 236, 9 A.3d 338 (2010); because of the much lower standard of proof applicable to probation violation cases. Furthermore, it is well established that, "[i]n making its factual determination [whether a condition of probation has been violated], the trial court is entitled to draw reasonable and logical inferences from the evidence. . . . [This court's] review is limited to whether such a finding was clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . [E]very reasonable presumption must be given in favor of the trial court's ruling." (Internal

quotation marks omitted.) *State* v. *Faraday*, 268 Conn. 174, 185, 842 A.2d 567 (2004).

In addition, "[u]nder Connecticut law, parents have a common-law duty to protect their children. . . . A defendant's failure to act when under a duty to do so, thereby permitting a dangerous situation to exist or continue, or a defendant's deliberate indifference to a dangerous situation that poses a risk of injury to a child, may be sufficient to support a conviction under the situation prong of § 53-21 (a) (1)." (Citation omitted.) *State* v. *Maurice M.*, supra, 116 Conn. App. 17. Thus, "a defendant who knowingly fails to provide for the protection of a child when that child is under [his or her] care . . . creates a situation that endangers the physical well-being of the child and, thus, [such failure] falls with the ambit of [§ 53-21 (a)]." *State* v. *Branham*, 56 Conn. App. 395, 402, 743 A.2d 635, cert. denied, 252 Conn. 937, 747 A.2d 3 (2000); see also *State* v. *Sorabella*, 277 Conn. 155, 173, 891 A.2d 897 ("[I]t is not necessary, to support a conviction under § 53-21, that the [accused] be aware that his conduct is likely to impact a child younger than the age of sixteen years. Specific intent is not a necessary requirement of the statute. Rather, the intent to do some act coupled with a reckless disregard of the consequences . . . of that act is sufficient to [establish] a violation of the statute." [Internal quotation marks omitted.]), cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006). "This duty to protect logically includes a duty to supervise one's [two year old] child, especially [when] there are known dangers that pose a risk of injury to that child." *State* v. *Maurice M.*, supra, 11.

With these principles in mind, I turn to the various factors that bear on the determination of whether the defendant's conceded failure to supervise his two year old child inside the home gave rise to a foreseeable risk of harm to that child. The first factor, the age and

maturity of the child, clearly supports the trial court's decision. "Common sense and experience inform us that young children are inquisitive and impulsive." *State* v. *Padua*, 273 Conn. 138, 159, 869 A.2d 192 (2005). Indeed, as one court observed in the context of a case involving a three year old, "[a] child may be so young as to be manifestly and utterly incapable of exercising any of those qualities of attention, perception, knowledge, experience, intelligence, and judgment which are necessary to enable the child to perceive a risk and to realize its unreasonable character." (Internal quotation marks omitted.) *Brown* v. *Smalls*, 325 S.C. 547, 556, 481 S.E.2d 444 (App. 1997). Thus, in a case involving a child just one month shy of his second birthday, the Florida Supreme Court aptly noted that "[i]t is a matter of common knowledge that small children are erratic and unpredictable, [and] that they are liable to take off at any time and in any direction with no concern whatever for their own safety." *Miami Paper Co.* v. *Johnston*, 58 So. 2d 869, 870 (Fla. 1952). This is especially true of two year old children, who, as every parent knows, have no sense of their own limitations and are prone to all manner of impulsive and reckless behavior. Among other things, they open doors, climb up and down stairs, place objects in their mouths and otherwise test the limits of their newly acquired motor skills, wholly without regard for the consequences. The trial court reasonably found, therefore, that the defendant's wilful failure to supervise his two year old child inside the home was particularly egregious because it was readily foreseeable that the child, if left unsupervised even for a very short period of time, might open the back door and wander away.

The evidence pertaining to the second factor, the gravity of the risk, also supports the trial court's decision. The state adduced testimony establishing that the defendant's home is located near one of East Windsor's

busiest thoroughfares, which, according to Sergeant Hannaford, is heavily traveled both on weekdays and weekends. On the day of the incident, the yard surrounding the house was unfenced, and the back door leading to the exterior of the house was not equipped with any type of lock or child safety device capable of preventing a two year old from opening it.[3] On the basis of this uncontroverted evidence, the trial court reasonably found that the proximity of the defendant's house to a busy thoroughfare and the existence of an inadequately secured back door posed a serious risk of harm to the unsupervised two year old child.

The third consideration is the length of time of the parental abandonment. Although there is no evidence either as to how long the two year old child was unsupervised inside the house before he exited through the back door or the total length of time that the child wandered around outside before he was found by a passing motorist, it is undisputed that approximately *one-half hour* had elapsed from the time that the child was found until the defendant appeared to retrieve him. Thus, even if it is assumed that the defendant spent up to ten full minutes searching for his son inside the house upon learning that the eight year old could not find him—it is highly unlikely that such a search would have taken any longer than ten minutes—the two year old

---

[3] Although the trial court observed during the dispositional phase of the proceeding that the defendant's yard was unfenced, common sense dictates that, if the defendant had placed a fence around the yard for his son's protection, the child never would have been able to reach the street on which he was found. Moreover, there was no evidence adduced during the adjudicatory phase of the probation revocation proceeding to suggest that there *was* a fence around the yard and that, somehow, the child was able to scale or otherwise circumvent it. The defendant certainly would have adduced evidence of a fence, if there had been one, because that evidence would have seriously undermined the state's case. Consequently, it is hardly unreasonable to presume that the trial court knew, at the time of the adjudicatory phase of the proceeding, that there was no fence securing the defendant's yard.

child would have been left alone, unsupervised, for about twenty minutes. It is beyond dispute that it is extremely dangerous to leave a two year old child without adult supervision for that extended period of time. Accordingly, the third factor strongly supports the trial court's decision.

Before addressing the remaining considerations, it is important to note that the majority itself does not dispute the fact that the three foregoing factors clearly support the trial court's determination. Indeed, with respect to those three factors, the majority expressly acknowledges that the defendant wilfully "fail[ed] to supervise his child inside the home," instead, leaving that task to an eight year old, even though "the back door . . . was not equipped with a child safety device" and even though the home was located only "100 feet from a narrow, small town road that, at times, was heavily traveled. . . . Between twenty and twenty-five minutes may have passed from the time that witnesses first saw the child outside the home to the time that the defendant appeared to retrieve his child . . . . From this information, the trial court could have concluded that the defendant's two year old son was without adult supervision for at least twenty-five to thirty minutes, and that the proximity of the defendant's home to a busy street presented a dangerous condition."

With respect to the fourth factor, the degree of parental accessibility, several cases of this court and the Appellate Court make clear that leaving young children at home alone for *any* appreciable period of time will support a *conviction* under § 53-21 (a) (1). See, e.g., *State* v. *Fields*, 302 Conn. 236, 261, 24 A.3d 1243 (2011) (leaving one year old child alone at home for any appreciable period of time is both dangerous and unsafe); *State* v. *Branham*, supra, 56 Conn. App. 398–99 (jury reasonably could have concluded that leaving three children, all under four years of age, unsupervised in house

even for short period of time posed serious risk of harm to those children); *State* v. *George*, 37 Conn. App. 388, 390, 656 A.2d 232 (1995) (leaving seventeen month child home alone led to conviction under risk of injury statute). Although the defendant in the present case did not leave his two year old child alone, common sense and experience dictate that a parent may be physically present in the home but not "accessible" to his or her children in any meaningful sense of the term for purposes of providing them with the care and supervision necessary under the circumstances. Furthermore, the degree to which a parent is accessible to a child inside the home necessarily depends on the age and maturity level of the child, and the vigilance or lack thereof of the parent. In the present case, the evidence indicated that the defendant completely abrogated his parental responsibility by leaving his child in the exclusive care and control of a second child, who himself was only eight years of age. The trial court reasonably found that this arrangement was entirely inadequate because the defendant, having placed himself in a position from which he personally was unable to react to an emergency or some other problem in a timely fashion, opted to rely on the limited skill and immature judgment of an eight year old. As this court expressly has stated, it is unreasonable to expect that an eight year old child will react responsibly to a potentially dangerous situation because of "the lack of judgment natural to so young a child . . . ." *Cote* v. *Palmer*, 127 Conn. 321, 326, 16 A.2d 595 (1940). It is no surprise, therefore, that the defendant did not learn that his two year old child had gone missing until being made aware of that fact by the eight year old a considerable period of time after the two year old actually had left the house. In such circumstances, the trial court reasonably found that, although the defendant was physically present in a different part of the house, his personal inattentiveness,

coupled with his obvious failure to make appropriate arrangements for the care and supervision of the two year old in his absence, rendered him functionally inaccessible for a sufficient period of time so as to subject the child to a serious risk of harm.

The fifth and final factor, the protective measures taken by the defendant to minimize the risk of harm, also militates in favor of a finding that the defendant had placed the two year old in a potentially dangerous situation with foreseeably disastrous consequences. Although the defendant made no effort to secure the back door and otherwise failed to child proof the house, he nevertheless saw fit to leave his son in the care and custody of an eight year old. It is readily apparent that an eight year old child is likely to be, and in the present case clearly was, too immature and too easily distracted to properly care for a younger child, particularly a child who is only two years of age. Indeed, the fact that the eight year old in the present case lost track of the two year old for a considerable period of time before alerting the defendant that he was missing is ample proof of this fact. Consequently, the trial court reasonably concluded that the only real protective measure that the defendant had taken, namely, enlisting an eight year old to supervise his two year old child, was so clearly inadequate as to render the defendant's conduct highly irresponsible.

Thus, the foregoing factors unquestionably support the trial court's findings, especially when those findings are viewed in the light most favorable to sustaining the trial court's determination. To conclude otherwise is simply to second guess the reasoned judgment of the trial court and to ignore the fact that the court's judgment was predicated on the preponderance of the evidence standard of proof. Although it undoubtedly is true that different fact finders might reasonably draw different inferences from the evidence in the present case, it simply cannot be said that *no reasonable fact*

*finder* could draw the inferences that the trial court did. The majority's reasons for its contrary conclusion do not withstand scrutiny.[4]

The majority posits two primary reasons why the evidence provides an insufficient basis for the trial court's judgment. First, the majority asserts that the evidence does not support the trial court's finding that the exterior of the defendant's home was accessible to his two year old child through the unlocked back door.[5] Second, the majority contends that the trial court "fail[ed] to give proper weight" to certain facts that, in the majority's view, reduced the foreseeability of the risk in this case, in particular, the defendant's accessibility to his children, the fact that the defendant left the two year old in the care of the eight year old, and the lack of evidence establishing that the two year old previously had left the house on his own.

With respect to the accessibility of the back door, the majority states that "[t]he only evidence offered relative to the back door . . . was [Sergeant] Hannaford's testimony 'that there [were] no safety devices on the doorknobs or such that . . . one would normally do with young children to prevent them from opening

---

[4] I note that, under the majority's analysis, despite the gravity of the risk and the fact that the defendant left his two year old child in the exclusive care of an eight year old child for an extended period of time, the trial court could not have found that it was more likely than not that the defendant had engaged in conduct inimical to the welfare of his two year old child under § 53-21 (a) (1) even if the child had been killed by a passing motorist. In my view, such a result hardly would be dictated by the facts.

[5] As the majority notes, although the trial court repeatedly referred to the "accessibility" of the back door, the "real concern" was "not so much the accessibility of the back door itself [but] . . . the accessibility of the exterior of the home *through* the back door." (Emphasis in original.) Footnote 6 of the majority opinion. "Because the basic claim is that the [two year old] child was able to access the exterior of the home through a back door that was somehow not secured in a manner that would prevent him from exiting"; id.; I also "refer to this factual component as the accessibility of the back door . . . ." Id.

the doors . . . .' " The majority asserts, however, "that Hannaford's testimony [was] too vague and ambiguous in its bare reference [to] a lack of safety devices to sustain the trial court's conclusion that the back door was accessible to the [two year old] child." Footnote 10 of the majority opinion. Specifically, the majority argues that, "[w]ith the exception of Hannaford's testimony that the back door did not have any 'safety devices,' the record is devoid of any other evidence relative to the nature of the back door, which undoubtedly is material to the ease with which a two year old child could have accessed the exterior of the home. For example, there is no clear indication in the record as to how many doors separated the interior of the home from the exterior . . . . There is also no indication as to whether the back door or doors were ajar or shut at the time the child exited the home. Moreover, there is no indication as to the method by which one would open the back door or doors, i.e., whether one must turn a doorknob and pull open the door; whether one must grasp a handle, depress a thumb lever and pull open the door; or whether one must press a small push latch and push open the door to exit (as is common with screen doors)." The majority also notes that, although Hannaford testified " 'that there [were] no [child] safety devices on the doorknobs' . . . there [was] no indication as to what exactly the missing 'safety device' was, i.e., whether Hannaford was referring to a circular plastic device that covers metallic doorknobs, a hook and eye mechanism to keep an exterior screen door from opening, or some other device." Text accompanying footnote 10 of the majority opinion. The majority concludes that "[a]ny of these factors could be relevant to determining whether the defendant reasonably would not have thought that his two year old child possessed the strength and manual dexterity to manipulate the door or doors open."

Contrary to the majority's assertions, there was overwhelming evidence to support the trial court's finding that, consistent with Hannaford's express testimony, the back door was not adequately secured to prevent a two year old from exiting, including, most obviously, evidence that *the child was found wandering in the street outside his home.* See *Goldstar Medical Services, Inc.* v. *Dept. of Social Services,* 288 Conn. 790, 834, 955 A.2d 15 (2008) ("[T]here is no distinction between direct and circumstantial evidence [insofar] as probative force is concerned . . . . In fact, circumstantial evidence may be more certain, satisfying and persuasive than direct evidence." [Internal quotation marks omitted.]); *Stein* v. *Tong,* 117 Conn. App. 19, 24, 979 A.2d 494 (2009) ("[T]riers of fact must often rely on circumstantial evidence and draw inferences from it. . . . Proof of a material fact by inference need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact." [Internal quotation marks omitted.]). Put simply, when a two year old disappears and subsequently is found outside his home, it is hardly unreasonable to conclude, in the absence of any other plausible explanation, that the child was able to leave the home though an unsecured door while the person or persons responsible for supervising the child were not paying attention. Indeed, in the normal course of events, it would be *impossible to reach any other conclusion,* especially in view of Hannaford's testimony that the door had not been secured.

The majority nevertheless maintains that the trial court could *not* reasonably have inferred from the child's presence outside the home that the exterior of the home was accessible to him through the back door. In support of this contention, the majority asserts that "the ease with which the child exited the home cannot

be presumed by the child's actual presence outside the home"; footnote 11 of the majority opinion; "the mere existence of a dangerous outcome does not necessarily dictate that there was an unsafe condition that caused it," and "the evidence is insufficient to sustain the conclusion that the back door was accessible, and the mere fact that the child was in a dangerous situation does not mean that an unsafe condition caused it." Footnote 14 of the majority opinion. Apart from these conclusory assertions, however, the majority offers no explanation whatsoever as to why the child's presence outside the home, coupled with Hannaford's testimony that the back door had not been adequately secured and the defendant's acknowledgment that the child "must have exited through the back door," is *not probative* of the accessibility of the back door, as well as the ease with which the child was able to leave the house. Although it is theoretically possible that the child exited the house in some other unexpected and unforeseeable manner, the trial court's conclusion that the child was able to leave the house because *there were no safety measures in place to prevent him from doing so* is hardly unreasonable. In fact, as I have indicated, in light of all of the possible explanations for the child being outside the house, an open or unlocked door is the *most* logical explanation, if not the *only* logical explanation, in view of the child's age and Hannaford's description of the back door as not having been child proofed or otherwise secured.

The majority also contends that the evidence was insufficient to support the trial court's findings concerning the accessibility of the back door because there was nothing in the record to indicate whether the child had to go through one door or two doors upon exiting, and because Hannaford did not describe the type of child safety devices that were missing from the doors. This parsing of the evidence by the majority is mani-

festly inconsistent with the proper role of an appellate tribunal, which is not to substitute its view of the evidence for that of the trial court but, rather, to consider the trial court's factual findings in the light most favorable to sustaining that court's judgment. For purposes of the present case, it hardly matters what type of child safety device was missing from the back door or whether there were two doors (a screen door in addition to an interior door) or one. Hannaford's unchallenged testimony that there were "*no safety devices* on the doorknobs or such that . . . one would normally [use] with young children to prevent them from opening . . . doors" was more than sufficient to support the trial court's finding that the door was *not adequately secured to prevent egress by a two year old child*. (Emphasis added.) The mere fact that Hannaford was not asked to describe in detail the various possible devices that were *not installed* on the back door neither detracts from the highly probative nature of his testimony with respect to the condition and accessibility of the door nor undermines in any way the trial court's finding that the two year old child was able to gain access to the exterior of the home through the door. To conclude otherwise, as the majority does, is to ignore the principle that a reviewing court must consider the evidence adduced in the light most favorable to sustaining the trial court's judgment; it is not this court's function to attempt to discredit that evidence by identifying potential factual issues that the parties did not explore but that possibly "could be relevant" to a contested issue in the case.[6]

---

[6] The majority asserts that the trial court's finding that the back door was inadequately secured is clearly erroneous because, according to the majority, that finding was predicated on the trial court's predicate finding that there was no lock on the back door, whereas the testimony indicated only that there were no child safety devices on the back door. The majority's conclusion is untenable because it is apparent that the trial court's finding that the back door had not been secured is supported by, and predicated on, certain undisputed facts, namely, that (1) there were no child safety devices on the door, (2) the two year old child was able to exit via the door, and

Furthermore, although the defendant bore no burden of proof at the probation revocation hearing, there was nothing to prevent the defense from presenting evidence concerning the condition of the back door for the purpose of rebutting Hannaford's testimony that it was not properly secured. Indeed, in his brief to this court, the defendant concedes that he did not argue in the trial court or in the Appellate Court that the evidence was insufficient to support a finding that the door was unlocked. His sole contention, rather, was that his conduct was not culpable, first, because it was not reasonably foreseeable that the child would leave the house while playing with his eight year old companion and, second, because "he [had taken] appropriate measures to address the danger by searching for the [two year old child]" upon learning that he had gone missing. Accordingly, in light of defense counsel's argument at the revocation hearing and the complete absence of any conflicting evidence regarding the accessibility of the door, there simply was no reason for the trial court *not* to credit Hannaford's testimony that the door was not secured so as to prevent a two year old from exiting through it. The trial court also reasonably could have inferred from the defendant's statement to Hannaford that the child "must have opened the back door" that the defendant was aware that the door was accessible to the two year old child. Although additional evidence establishing the degree or extent of the door's accessibility, in the form of a photograph or other testimonial evidence, might have strengthened the state's already convincing case, it cannot seriously be maintained that the evidence was devoid of facts from which the trial court reasonably could have found that the back door was accessible to the two year old child. See, e.g., *Wolk*

(3) the defendant himself observed that the child "must have opened the back door," a comment that the court reasonably could have understood as reflecting the defendant's knowledge that the child could and did open the inadequately secured back door.

v. *Wolk*, 191 Conn. 328, 330, 464 A.2d 780 (1983) ("[u]nless there were no facts [on] which the [trial] court could base its finding, we as an appellate body cannot retry the case or substitute our judgment for that of the trial court"). In reaching its contrary conclusion, the majority violates the bedrock principle that, on appeal, we do not ask whether there is a reasonable view of the evidence that would result in a finding favorable to the defendant; rather, we ask whether there is a reasonable view of the evidence that supports the finding of the trier of fact. See, e.g., *State* v. *Davis*, 283 Conn. 280, 330, 929 A.2d 278 (2007). In the present case, the evidence was more than sufficient to support the trial court's finding.

The majority also concludes that the trial court failed to give proper weight to the fact that the defendant was accessible to his children, that the defendant left the two year old child in the care of the eight year old, and that the two year old previously had never left the house on his own. Specifically, the majority states: "The defendant's proximity and accessibility to the [two year old] child mitigates the child's young age and reduces the foreseeability of the child's escape. Hannaford also testified that the two year old child was playing with an eight year old child. Although we recognize that an eight year old child lacks the maturity and responsibility of an adult, we note that his presence alone carries some weight; the two year old child was not wandering around the home completely unattended. . . . Further, Hannaford's testimony established that the child had never left the house before under these circumstances. Though we certainly recognize that the state need not wait for catastrophic harm to occur . . . before prosecuting an individual for violating § 53-21 . . . as a general proposition, the history, or lack thereof, of past occurrences provides evidence of the foreseeability of

a given harm."[7] (Citation omitted; internal quotation marks omitted.)

Although it is true that the presence of the defendant and the eight year old child carries some weight, the trial court's failure to ascribe to those facts *the same weight* as the majority does not render the trial court's conclusions unreasonable. Indeed, it is perfectly clear from the record that the trial court considered all of the factors identified by the majority but simply viewed the evidence in a different light. For example, the trial court reasonably concluded that the defendant's presence in the home did not militate significantly against the foreseeability of the risk because the defendant knew or should have known that he could not safely and prudently place his two year old child within the exclusive supervision of an eight year old for an extended time period. Simply stated, the trial court's conclusion in this regard is logically unassailable.

No less reasonable is the trial court's unwillingness to give significant weight to the age of the child whom the defendant tasked with the responsibility of supervising his two year old son. Nevertheless, the majority seeks to undermine the trial court's finding in this regard, stating: "Although we recognize that an eight year old child lacks the maturity and responsibility of an adult, we note that his presence alone carries some weight; the two year old child was not wandering around the home completely unattended. Moreover, we also note that the eight year old child demonstrated at least some minimal level of responsibility by notifying

---

[7] I again note that the majority casts its argument in terms expressly calculated to convey the impression that the present case involves "prosecuting an individual for violating § 53-21 . . . ." Contrary to the misleading implication of the majority, this case does not involve a criminal prosecution, which would require proof beyond a reasonable doubt. Rather, the only issue presented by this case is whether, for purposes of the defendant's probation revocation hearing, the trial court reasonably concluded that the state had established a violation of § 53-21 (a) (1) by a preponderance of the evidence.

the defendant that the child was missing." What weight or import to give to the fact that the two year old child was not left completely unsupervised but, rather, was placed in the care of an eight year old, is a quintessential issue of fact for resolution by the trier of fact, and, as such, that determination is entitled to great deference. See, e.g., *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, 250 Conn. 334, 346, 736 A.2d 824 (1999) ("we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass [on] the credibility of witnesses" [internal quotation marks omitted]). Indeed, to the extent that the majority suggests that the trial court was required to give at least "some weight" to the fact that the two year old child was being supervised by an eight year old and had not been left completely unattended, there is nothing in the record to suggest that the trial court did not give that fact due weight and consideration. Thus, the argument that the majority advances in support of its contention that the trial court's findings are unsupported by the evidence or otherwise mistaken is, in reality, a classic example of prohibited appellate fact-finding.

With respect to the fact that the child previously had not left the house unaccompanied, as the majority itself acknowledges, there is no rule that caregivers are entitled to one bite at the apple before it may be determined that their conduct created a situation inimical to the well-being of the child. Indeed, if that were the case, the protections of § 53-21 would be largely illusory. Accordingly, the trial court was under no obligation to conclude that the primary risk of harm in this case, that is, that the two year old child would open the back door and go outside, was unforeseeable because the child never had done so beforehand. To the contrary, it is common knowledge that two year old children often attempt new feats without regard for the consequences.

Indeed, that a two year old might one day attempt to open a door is perhaps one of the most foreseeable risks a parent faces, which is why, as the trial court explained, parents child proof their homes well in advance of the time that the risk presents itself. The trial court also reasonably could have concluded that, although this risk was readily foreseeable to an adult, it was not foreseeable to an eight year old child, who lacks the experience, judgment and maturity to anticipate such dangers. Because the trial court's findings with respect to all of the relevant factors are fully supported by the evidence, this court lacks the authority to reverse the trial court's judgment merely because it would have drawn different inferences from that evidence if it had been the fact finder.[8] See, e.g., *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 534, 733 A.2d 197 (1999) ("[i]f the [trier] could reasonably have reached its conclusion, the verdict must stand,

---

[8] I note that the majority also states that, "notwithstanding the evidence relative to the severity of the possible harm, the length of time during which the child was outside, the age of the child and the absence of a safety device on the doorknob, on the basis of the mitigating factors detailed previously, we are left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) In relying on this second prong of the clearly erroneous test; see *State* v. *Benjamin,* supra, 299 Conn. 236 ("[a] court's finding of fact is clearly erroneous and its conclusions drawn from that finding of fact lack sufficient evidence when there is no evidence in the record to support [the court's finding of fact] . . . *or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed*" [emphasis added; internal quotation marks omitted]); the majority appears to concede that there *was* evidence adduced at the defendant's probation revocation hearing that was sufficient to support the trial court's conclusion. With respect to the majority's assertion that it harbors a definite and firm conviction that the trial court nevertheless was mistaken in finding, by a preponderance of the evidence, that the defendant had violated his probation, I disagree with that conclusion because, for the reasons set forth in this opinion, the evidence amply demonstrated that the defendant acted with a reckless disregard for the consequences of leaving his two year old child under the exclusive care and supervision of an eight year old child for approximately one-half hour.

even if this court disagrees with it" [internal quotation marks omitted]).

I also disagree with the majority's contention that to affirm the judgment of the trial court "would be to hold a parent, who is home alone and solely responsible for the care and supervision of one or more young children, criminally responsible under what would essentially be a theory of strict liability for leaving his or her children unsupervised inside the home for a short period of time, an illogical and impracticable result. In this case, the record merely establishes that the defendant exhibited less than ideal parenting . . . ." This assertion is wrong for several fundamental reasons. First, the trial court manifestly did not hold the defendant "criminally responsible" under a "theory of strict liability . . . ." Despite the majority's concerted effort to suggest otherwise, this is not a criminal case, and the majority's assertion to the contrary notwithstanding, our resolution of this appeal simply has no bearing on how we would resolve the defendant's insufficiency claim if this had been a criminal case. As we repeatedly have observed, a probation violation case is a civil case, with the state bearing the burden of persuasion by a preponderance of the evidence.[9] In such cases, the state

[9] "[A] probation revocation involves an individual who has already [pleaded] guilty to a crime or been found guilty beyond a reasonable doubt. This offender has subsequently entered into a probation agreement that is essentially a contract with the court: the court agrees to stay part or all of the statutory sentence, and the probationer in turn agrees to perform or abstain from performing certain acts." *State* v. *Hodges*, 798 P.2d 270, 278 (Utah App. 1990); see also *State* v. *Davis*, supra, 229 Conn. 296 (observing that burden of proof in probation violation case must be predicated on nature of probation conditions, which are analogous to contract). Thus, probation revocation hearings "are not concerned with punishment or retribution. . . . Rather, probation seeks to normalize the probationer into society as soon as reasonably possible, and the revocation hearing presents the ultimate question whether the probationer is still a good risk to be continued in that status. . . . [Moreover], any punishment involved is attributable to the crime for which [the defendant] was originally convicted and sentenced, rather than to the changes on which the violation of probation is based." (Citations omitted; internal quotation marks omitted.) *State* v. *McDowell*, 242 Conn. 648, 653, 699 A.2d 987 (1997).

and the defendant "share the risk of error in roughly equal fashion. . . . [B]ecause we . . . assign the risk of error almost equally, we require only a modicum of subjective certitude on the part of the fact finder: [as] long as the [court] is persuaded that the [state's] assertions are probably more true . . . the [state] has met [its] burden of persuasion." (Internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 210, 833 A.2d 363 (2003). Thus, in the present case, the state was required to prove the elements of § 53-21 (a) (1) by a mere preponderance of the evidence. In other words, the state bore the burden of persuading the trial court only that it was more likely than not that the defendant's conduct in placing his two year old child under the exclusive supervision of an eight year old child, without having undertaken efforts to secure the back door, was inimical to the well-being of the two year old child, in violation of § 53-21 (a) (1). In criminal cases, by contrast, "because . . . we impose almost all of the risk of error on the state, we require the fact finder to have a very high degree of subjective certitude: no reasonable doubt about the defendant's guilt." Id., 211. In view of the significant difference in the two legal standards, a finding by a preponderance of the evidence that the defendant violated his probation by engaging in conduct detrimental to the safety of a child has no bearing on whether that same conduct constitutes a *criminal* violation of that statute. See *State* v. *Benjamin*, supra, 299 Conn. 236 (outcome of criminal proceeding irrelevant to determination on same facts made in probation revocation hearing).

Furthermore, the trial court manifestly did not find the defendant strictly liable for his two year old child's conduct in exiting through the back door. In fact, the trial court's reasoned decision contains a thorough and thoughtful explanation—an explanation fully supported by the evidence—detailing the reasons why the defen-

dant, in placing his son under the exclusive care and custody of another child for an extended period of time, knowingly had created a situation inimical to the physical well-being of his child, in violation of § 53-21 (a) (1). Thus, the majority's alarmist rhetoric regarding the potential impact of this case on future criminal prosecutions is wholly unwarranted.

Finally, I take issue with the majority's characterization of the present case as one in which the defendant "merely . . . exhibited less than ideal parenting" by leaving his child "unsupervised inside the home for a short period of time . . . ." This assertion exemplifies the majority's approach of substituting its own view of the evidence for that of the trial court, which expressly found that this is *not* simply a case of poor parenting. Furthermore, although there was no evidence as to exactly how long the two year old child was unsupervised inside the house or how long he wandered around outside the house before he was found, we do know that approximately *one-half hour* had passed from the time that he was found until the defendant appeared to retrieve him. Contrary to the contention of the majority, the trial court reasonably could have concluded that thirty minutes is *not* a short period for a two year old child to be without adult supervision. Indeed, experience and common sense dictate that that is the *only* reasonable conclusion that may be drawn.[10] Because

---

[10] The majority also is wrong that the trial court reasonably could not have considered the defendant's nonchalant and detached demeanor when the defendant went outside to retrieve his child. In particular, the majority asserts that "such reliance is misplaced" because "what occurred after the defendant emerged from the home and, indeed, after the child found his way outside, is irrelevant to the factual predicates necessary to prove a violation of § 53-21 (a) (1)." Footnote 15 of the majority opinion. To the extent that the defendant's demeanor reasonably could be interpreted as having a bearing on his conduct prior to the child's leaving the house, that demeanor *is* relevant. Thus, in the present case, the court reasonably could have considered the fact that the defendant appeared to be wholly unconcerned about what had just occurred, a reaction that reflects the defendant's indifference to the welfare of his child. This, in turn, supports an inference

the evidence supports the trial court's finding, and because the evidence also supports the trial court's ultimate determination that the defendant wilfully placed his child in a situation that created an undue risk of serious harm—the very harm that would have befallen the child but for the attentiveness of the motorist who rescued him—there is no lawful basis for disturbing the judgment of the trial court. I therefore agree with the Appellate Court that the trial court's judgment revoking the defendant's probation should be affirmed. Accordingly, I dissent.

that the defendant also was unconcerned about the risks associated with leaving his two year old child under the exclusive supervision of an eight year old and about the necessity of taking appropriate measures both to child proof his home and to obtain appropriate supervision for his child in the defendant's absence.