******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

ELGO, J., dissenting. In the present case, the trial court found, by a preponderance of the evidence, that the defendant, Kerlyn M. Taveras, violated the terms of his probation by committing the misdemeanor of breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (1).[1] I believe that the testimonial and documentary evidence admitted at the probation revocation hearing substantiates that finding. Accordingly, I respectfully dissent.

At the outset, I note a basic point of disagreement with the majority, as I do not believe that the defendant was found in violation of probation solely on the basis of the words that he used on the afternoon of March 11, 2014. To the contrary, I believe that a fair reading of the trial court's oral decision indicates that the court predicated its finding on the defendant's conduct that afternoon. As the majority acknowledges, the court in its decision explicitly stated that its judgments were based in part on "the threatening nature and demeanor of" the defendant. In my view, the critical question is whether the record contains evidence to support a finding that the defendant, through his conduct and demeanor as the events of March 11, 2014, unfolded, engaged in threatening behavior in a public place, as § 53a-181 (a) (1) requires.

Before turning to the evidence admitted at the probation revocation hearing, I note the well established standard that governs review of the evidentiary phase of such proceedings. "The law governing the standard of proof for a violation of probation is well settled. . . . [A]ll that is required in a probation violation proceeding is enough to satisfy the court within its sound judicial discretion that the probationer has not met the terms of his probation. . . . It is also well settled that a trial court may not find a violation of probation unless it finds that the predicate facts underlying the violation have been established by a preponderance of the evidence at the hearing—that is, the evidence must induce a reasonable belief that it is more probable than not that the defendant has violated a condition of his or her probation. . . . In making its factual determination, the trial court is entitled to draw reasonable and logical inferences from the evidence. . . . Accordingly, [a] challenge to the sufficiency of the evidence is based on the court's factual findings. The proper standard of review is whether the court's findings were clearly erroneous based on the evidence. . . . A court's finding of fact is clearly erroneous and its conclusions drawn from that finding lack sufficient evidence when there is no evidence in the record to support [the court's finding of fact] . . . or when although there is evidence to support it, the reviewing court on the entire evidence

is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, *every reasonable presumption must be given in favor of the trial court's ruling*." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Maurice M.*, 303 Conn. 18, 26–27, 31 A.3d 1063 (2011). Furthermore, as with any evidential insufficiency claim, we do not ask whether there is a reasonable view of the evidence that would result in a finding favorable to the defendant; rather, we ask whether there is a reasonable view of the evidence that supports the finding of the trier of fact. See *State* v. *Revels*, 313 Conn. 762, 778, 99 A.3d 1130 (2014), cert. denied,     U.S.     , 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015).

The evidence before the trial court included the testimony of the defendant's probation officer, Christopher Kelly, and Monica Bevilaqua, the director of the preschool where the altercation in question transpired. Also admitted into evidence were various documents regarding the defendant's underlying convictions, as well as the violation of probation arrest warrant application (application) prepared by Kelly, which was admitted as a full exhibit without any objection by the defendant.[2]

As noted in the majority opinion, the defendant arrived at the preschool approximately forty minutes late on the afternoon of March 11, 2014.[3] When he arrived, Bevilaqua testified that the defendant was "irritated and not happy with staff," and "already escalated." After picking up his son from his classroom, Kelly stated, in his sworn affidavit included in the application, that the defendant "became extremely agitated" and then "began to argue with staff." That affidavit further indicates that the argument grew so heated that "[s]taff told [the defendant] that he had to leave because he was arguing with staff in the front lobby in front of other children and their parents."[4] Bevilaqua testified that, as the defendant exited the preschool, the assistant education manager "said something back to him." In response, Bevilaqua testified, the defendant, who was then outside the locked door, "turned and said, better watch yourself, you better be careful . . . ." In the affidavit contained in the application, Kelly stated that the defendant was yelling as he made those remarks.[5] As Kelly's affidavit indicates, preschool staff reported that the defendant was "so enraged" and "intimidating" at that time. Moreover, after uttering those remarks, Bevilaqua testified that the defendant attempted "to get back in" the preschool, but could not penetrate the locked door. Although the majority correctly notes that there is no evidence describing precisely how the defendant attempted to open the door, I believe the critical import of the evidence of his attempted reentry is that it demonstrates that the defendant's shouted remarks not only were made while he was in an enraged state, but were accompanied by a physical gesture that the

court reasonably could infer to be aggressive in nature.

The court also was presented with evidence of the reaction that the defendant's conduct and demeanor caused among preschool staff that afternoon. Bevilaqua testified that when she arrived at the preschool shortly after the altercation, her staff informed her that they had been threatened by the defendant and, as a result, were "shaken up" and very concerned. Bevilaqua testified that she personally had observed the defendant behave in a threatening manner on a prior occasion, which informed her response to the reports of her staff. Bevilaqua explained that the preschool's "internal policy" was to contact police "when something escalates" to the point of "[s]taff being threatened." Consistent with that policy, Bevilaqua testified that she contacted the Danbury Police Department, whose officers took statements from staff members. Questioned as to how she differentiates between "a small threat, like . . . I hate this place," and something "larger" and more substantial, Bevilaqua testified that she was "trained to know the difference." In making the determination to contact law enforcement, Bevilaqua also indicated that she was cognizant that this "certainly wasn't our first escalated interaction" with the defendant.

Bevilaqua was present as police officers took statements from her staff regarding the incident. She also confirmed that the altercation had an effect on people within the preschool for the remainder of that day. In light of the defendant's conduct at the preschool, Bevilaqua asked the Danbury Police Department to ensure that the defendant "not be allowed back on" the preschool property.[6] She also looked into "whether or not we could get a restraining order" against the defendant because she was "that concerned about his behavior." Later that night, Bevilaqua was informed by an officer of the Danbury Police Department that the defendant had been arrested. Despite that arrest, Bevilaqua nevertheless took further actions to protect the preschool, testifying that "[w]e hired a police officer to be there the next morning."

At the probation revocation hearing, Kelly testified that "[the defendant] and I had a conversation after his breach of peace arrest" stemming from the defendant's conduct at the preschool on March 11, 2014. In that conversation, Kelly and the defendant discussed the defendant's need "to cool it" and "not be as confrontational in situations." Also in evidence before the trial court was documentation of the convictions underlying the defendant's probation. The record indicates that the defendant had pleaded guilty, under separate dockets, to two counts of threatening in the second degree in violation of General Statutes § 53a-62 and one count of assault in the third degree in violation of General Statutes § 53a-61 (a) (1). That evidence was admitted without objection by the defendant and properly informed

the court's perspective as trier of fact in the present case. See *State* v. *Megos*, 176 Conn. App. 133, 148, 170 A.3d 120 (2017).

In light of the foregoing evidence, I believe that the court reasonably could determine that the defendant, "with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof," engaged in threatening behavior in a public place in violation of § 53a-181 (a) (1). Significantly, the present case involves not a criminal prosecution, but a probation revocation hearing, which "is not a criminal proceeding." *Minnesota* v. *Murphy*, 465 U.S. 420, 435 n.7, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984). Rather, "the probation revocation procedure established by [General Statutes] § 53a-32 is akin to a civil proceeding." *State* v. *Davis*, 229 Conn. 285, 295, 641 A.2d 370 (1994). Criminal cases such as *State* v. *Krijger*, 313 Conn. 434, 97 A.3d 946 (2014),[7] in which the beyond a reasonable doubt burden of proof applied, therefore are distinguishable from the present case, as "a probation violation need be proven *only* by a preponderance of the evidence" and "need not be sufficient to sustain a violation of a criminal law." (Emphasis altered; internal quotation marks omitted.) *State* v. *Megos*, supra, 176 Conn. App. 139; see also *State* v. *Smith*, 207 Conn. 152, 177, 540 A.2d 679 (1988) ("the authorities are virtually unanimous in concluding that the standard of proof used in a criminal trial, namely 'beyond a reasonable doubt,' is not applicable to a probation revocation hearing"). At a probation revocation hearing, the state, therefore, must present evidence that induces "a reasonable belief that it is more probable than not that the defendant has violated a condition of his or her probation." *State* v. *Davis*, supra, 302. Measured by that standard, I believe the evidence before the court sufficiently established a violation of § 53a-181 (a) (1).

In reaching that conclusion, I am mindful of the trial court's superior vantage point, as finder of fact, to "credit and weigh" the evidence before it. *Rockhill* v. *Danbury Hospital*, 176 Conn. App. 39, 52 n.6, 168 A.3d 630 (2017); accord *Pagano* v. *Ippoliti*, 245 Conn. 640, 654, 716 A.2d 848 (1998) ("[t]he trial court, having heard the testimony and observed the witnesses, was in a position far superior to ours to judge the evidentiary record as a whole"). By their very nature, appellate tribunals are not privy to the inflections in a witness' voice or the body language that the printed record cannot capture. For that reason, courts like ours afford a great degree of deference to the subsidiary findings and credibility assessments of the trial court. See *Jones* v. *State*, 328 Conn. 84, 96–97, 177 A.3d 534 (2018). In its oral decision, the court credited Bevilaqua's testimony, finding that she took steps to secure the preschool on March 11, 2014, which included immediately contacting law enforcement, due to the "threatening nature and the demeanor" of the defendant that afternoon. In so

evaluating Bevilaqua's testimony, the court observed details that the record before us does not reflect. We therefore are obligated to defer to the court's assessment of the credibility of, and proper weight accorded to, that evidence.

Furthermore, it is fundamental to our law that the finder of fact is entitled to draw reasonable inferences from the evidence before it. See *State* v. *Berger*, 249 Conn. 218, 224, 733 A.2d 156 (1999) (trier of fact may draw whatever inferences from evidence it deems reasonable or logical). When a trial court "makes a factual determination of whether a condition of probation has been violated," it likewise is free to "draw reasonable and logical inferences from the evidence." (Internal quotation marks omitted.) *State* v. *Faraday*, 268 Conn. 174, 185, 842 A.2d 567 (2004). In its oral decision, the court expressly noted its ability to make such inferences as part of its finding that the defendant violated a condition of his probation. Our obligation to make every reasonable presumption in favor of the trial court's finding that the defendant violated the terms of his probation; *State* v. *Hill*, 256 Conn. 412, 425–26, 773 A.2d 931 (2001); encompasses such inferences.

In his principal appellate brief, the defendant argues that "if the defendant shouted, 'you better watch yourself, you better be careful,' to [a staff member] as she attempted to cross the street in front of an out-of-control truck, her reaction would not be fear or offense but gratitude." The defendant also offers a series of purportedly "plausible reading[s]" of those remarks. What the defendant fails to appreciate is the precise context in which his remarks arose. This is not a case of a bystander alerting a pedestrian to an errant vehicle. Nor is it a case, as the defendant's counsel hypothetically suggested at the revocation hearing, of a parent who simply "comes to the school [and] gets mad and says . . . you better watch it . . . ." Rather, the evidence adduced at the revocation hearing indicates that this is a case in which those remarks were made by an individual on probation for committing, inter alia, the crime of threatening in the second degree. This is a case in which the evidence indicates that the defendant arrived at the preschool "already escalated" and, after picking his son up from his classroom, engaged in an argument with preschool staff in front of other students and parents. The record further indicates that while arguing with staff, the defendant "became extremely agitated," to the point that staff informed the defendant that he had to leave the premises. In addition, the record indicates that when the defendant made the remarks in question, he was yelling at the preschool staff, and then immediately attempted to penetrate the locked door and reenter the preschool, conduct which the court reasonably could infer to be an aggressive physical gesture.

The court was presented with evidence that the staff present during the altercation with the defendant described him as "so enraged" and "intimidating" at that time. The court also heard testimony that the preschool staff was so shaken and alarmed by the behavior of the defendant that they called the police, explored the possibility of obtaining a restraining order against the defendant, and then hired a police officer to be present at the preschool the following day. The defendant's probation officer testified that, following that incident, he and the defendant discussed the defendant's conduct at the preschool and his need to "cool it" and not be so "confrontational."

Given that evidence, which provides the necessary context in which this altercation arose, I believe that the trial court reasonably could find, by a preponderance of the evidence, that the defendant violated his probation pursuant to § 53a-32 (a) by having committed a breach of the peace in the second degree in violation of § 53a-181 (a) (1). In its appellate brief, the state analogizes the present case to *State* v. *Simmons*, 86 Conn. App. 381, 389, 861 A.2d 537 (2004) (conviction based on defendant's conduct and not his speech), cert. denied, 273 Conn. 923, 871 A.2d 1033, cert. denied, 546 U.S. 822, 126 S. Ct. 356, 163 L. Ed. 2d 64 (2005),[8] and submits that the defendant's threatening remarks "were simply a component of his disruptive and aggressive conduct while the preschool was still in session." I agree.

Were this a criminal prosecution governed by the beyond a reasonable doubt standard, the evidence in the record might well be insufficient to sustain a finding that the defendant violated § 53a-181 (a) (1). This case involves a probation revocation hearing, however, at which a less burdensome standard of proof applies. In such proceedings, the trial court, as finder of fact, draws inferences and makes predicate factual findings to which every reasonable presumption must be given in favor of their correctness. *State* v. *Maurice M.*, supra, 303 Conn. 26–27. Applying that standard to the evidence in the record, I would affirm the judgments of the trial court finding the defendant in violation of the terms of his probation.[9]

[1] General Statutes § 53a-181 (a) provides: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or (2) assaults or strikes another; or (3) threatens to commit any crime against another person or such other person's property; or (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person; or (5) in a public place, uses abusive or obscene language or makes an obscene gesture; or (6) creates a public and hazardous or physically offensive condition by any act which such person is not licensed or privileged to do. For purposes of this section, 'public place' means any area that is used or held out for use by the public whether owned or operated by public or private interests."

I recognize that the judgment file does not state precisely which subdivision of § 53a-181 (a) the court found applicable to the present case. At the same time, I agree with the majority that the state's theory of the case at trial was that the defendant had committed a violation of § 53a-181 (a) (1)

due to his threatening behavior at the preschool on the afternoon of March 11, 2014. I also agree with the majority that the court, in its oral decision, ultimately found that the defendant "violated his probation by committing the crime of breach of the peace in the second degree on the basis of his 'threatening nature and . . . demeanor' at the preschool." In light of the foregoing, the court's decision reasonably may be construed to conclude that the defendant violated § 53a-181 (a) (1). Furthermore, the defendant did not request an articulation to clarify the court's determination; cf. *State* v. *Pierce*, 64 Conn. App. 208, 210, 779 A.2d 233 (2001) (defendant requested articulation of precise crime on which court found him in violation of probation); and the defendant in this appeal has not claimed that he lacked adequate notice of the grounds on which he was found to have violated his probation. See *State* v. *Maye*, 70 Conn. App. 828, 839, 799 A.2d 1136 (2002).

[2] At the first day of the probation revocation hearing, the court inquired whether the violation of probation arrest warrant application was a full exhibit. In response, the state's attorney stated: "I have no objection to it being a full exhibit, Your Honor. I know [defense] counsel had referred to the court having it. I don't know if counsel has any objection to the violation of probation [application] being a full exhibit. [Defense counsel]?" The defendant's counsel, Attorney Gerald Klein, at that time stated, "Oh yes. I have no objection." The violation of probation arrest warrant application then was admitted as a full exhibit and marked as court exhibit A. In this appeal, the defendant has raised no claim with respect to the admission of that application or the contents thereof.

[3] Bevilaqua testified that this was not the first time that the defendant had been late to pick up his son from the preschool and acknowledged that there had been prior incidents with the defendant at the preschool. She further testified that, when she received the initial report of the altercation with the defendant, she hurried back to the preschool "because knowing what we knew about the family and the situation, I knew it would get escalated."

[4] I recognize that Bevilaqua was asked whether the defendant had used "[t]hreatening words" prior to exiting the doors of the preschool, and that she responded, "[a]t that point they were not." Bevilaqua nonetheless did not testify that the defendant's *behavior* was not threatening at that time.

[5] Kelly's sworn statement in his affidavit, which was admitted as part of court exhibit A, undermines the defendant's claim in his reply brief that there was no evidence that he "yelled, screamed, [or] raised his voice" when making those remarks.

[6] In his affidavit, Kelly stated that, following the defendant's arrest on the charge of breach of the peace in the second degree, the defendant "was advised not to return to the [preschool] again, otherwise he would be arrested for criminal trespass."

[7] In *State* v. *Krijger*, supra, 313 Conn. 458, the defendant immediately "apologized for his behavior" following a heated confrontation with an attorney and stated that "he hoped it would not adversely affect their working relationship." As our Supreme Court emphasized, "[t]he defendant's contrition immediately following the incident is decidedly at odds with the view that, just moments beforehand, he had communicated a serious threat . . . ." Id. No such contrition was expressed by the defendant in the present case.

[8] In *Simmons*, the beyond a reasonable doubt metric applied. *State* v. *Simmons*, supra, 86 Conn. App. 385–86. The present case, by contrast, involves a preponderance of the evidence determination.

[9] I recognize that the defendant has raised other claims in this appeal, including ones pertaining to the admission of hearsay testimony. Having reviewed those arguments in light of applicable law, I perceive no error on the part of the trial court.